### JULIA A. GODDARD v. DEXTER D. WESTCOTT.

*Breach of promise to marry—Evidence—Fraud—Damages.*

1.  In a suit to recover damages for breach of promise to marry, the plaintiff was allowed to testify to what third persons had told her that defendant had said about her physical disabilities, which testimony is held to be hearsay, and not to fall within any of the exceptions within which such evidence is sometimes admitted; but if such testimony is admitted, it is competent to cross-examine plaintiff as to statements made by her on the subject of such disabilities.

2.  The right of a plaintiff to recover damages for breach of promise to marry involves something more than a determination whether such a contract was in fact made. It must further appear that the plaintiff was at the time capable of making such a contract, and of carrying it out, without fraud or injury to the defendant; and if it appears from plaintiff's testimony that she knew she was diseased, or in any way physically disqualified from entering into the marriage state, and concealed such fact from the defendant, such facts amount to a fraud upon the defendant, which will prevent plaintiff from recovering any, except, possibly, nominal, damages, upon the case as made by herself, and without reference to any defense.

3.  While exemplary damages may be recovered in a suit for breach of promise to marry as a part of the general damages, in a proper case, and without specially pleading the facts warranting the allowance of the same, it must appear that there has been something more than a refusal, without sufficient legal excuse, to carry out the contract, before such damages can be recovered.

4.  In a breach of promise of marriage suit the court instructed the jury that, if their verdict was for the plaintiff, she could recover, as compensatory damages, for loss of time; for expenses incurred in making preparations for the marriage; for mental suffering occasioned by the breach of the contract; for injury to her health, if any; for loss of a permanent home, and the worldly advantages she might have derived therefrom; for damages to her reputation, moral or physical; for injury to her future prospects of marriage; and for any humiliation, contempt, or mortification she may have suffered in the circles wherein she moved by reason of such breach of contract. And

it is held that the charge did not permit the recovery of any damages which could be deemed special, or which were not recoverable under a general declaration in the usual form.

Error to Kent.  (Burch, J.)    Argued June 25, 1890. Decided August 1, 1890.

Case.  Defendant brings error.    Reversed.    The facts are stated in the opinion.

*Tatem & Quinsey,* for appellant.

*Crozier & Cutler,* for plaintiff.

CAHILL, J.  This is an action for damages for a breach of promise of marriage.  The declaration is in the ordinary form where no special damages are claimed, and the plea is the general issue, without notice of special defense.

The plaintiff was about 40 years of age when her alleged engagement to the defendant took place, and the defendant was about 70.  She and the defendant lived at Byron Center, in Kent county.  The plaintiff had made her home for the most part with her brother-in-law, except at intervals, when she was employed at domestic service in the neighborhood.  She became acquainted with defendant in the winter and spring of 1886.  At that time she lived in his family, and was employed as cook, housekeeper, and nurse for his wife, who was an invalid, and who soon after died.

The plaintiff claims that about two and a half years after the death of defendant's wife, and in the fall of 1888, he began to pay his addresses to her, with a view to matrimony,—waited upon her, took her out riding and to church, and had numerous interviews with her, at each of which, after the first, he proposed marriage; that she declined giving him a definite answer until she had

considered the matter, and had consulted with her friends; that she also urged her fear that a certain married daughter of defendant, living at Elyria, Ohio, would object to the match. Plaintiff claims that she also urged as obstacles to the union certain discrepancies of disposition and habits of life which she feared could not be reconciled, but that defendant promised to reform his habits of life, and to conform to her ideas; that finally all the differences were reconciled except the consent of the daughter in Ohio, and that this objection was urged by her, and not by defendant. She claims that defendant was urgent for an answer before October 9, on which date there was to be an excursion to Ohio, and, if she gave her consent, they were to go down to Ohio together, and be married there; that, on the Sunday evening preceding the proposed excursion to Ohio, plaintiff had promised defendant a definite answer; that on this particular Sunday in question the parties were together the most of the day and evening, at which time plaintiff finally gave her consent; that, on the Tuesday following, they, in company with others from their neighborhood, started on the excursion to Ohio; that they sat together in the same seat during the entire trip, until they reached Elyria, where the defendant stopped, but the plaintiff went on to Cleveland, with the understanding that a few days after she would return to Elyria, where they had mutual friends, and that defendant would meet her, and they would then be married.

Plaintiff claims that she returned to Elyria as promised; that defendant met her at the train, and told her that his daughter, Mrs. Langton, had been very much excited when he told her of his contemplated marriage with the plaintiff, that she had had fits which lasted three days, and that the proposed marriage would have to be delayed for some time; that she went from the train to

her cousin's house in the village, with the understanding that defendant should call and see her soon after. She claims, also, that her contemplated marriage had in some manner become known to her friends and relatives in Elyria, and that, when they questioned her about it, she admitted it, and told them that she was waiting in expectation of the defendant's coming to see her. She claims to have waited at one place for nearly a week, and at another place for three days, in hourly expectation that the defendant would come to see her, and arrange for the marriage, and that she was greatly humiliated by his failure to come, and by the commiseration of her friends on account of the defendant's neglect of her; that, hearing that defendant was about to return to Byron Center, she went to the depot for the purpose of returning with him; that defendant did not appear, and she came without him, reaching home on November 5; that some days afterwards the defendant returned; that she met the defendant casually at a neighbor's soon after his return; that nothing special was said about their relations; that about November 22 or 23 she learned for the first time that the defendant was married; and in company with her brother-in-law, Mr. Carpenter, and Mr. Drinkall, she went to defendant's house to see him in relation to it. She there, in the presence of her friends, charged him with having deceived her, and with having married another woman. He denied that he was married, and gave as reasons for his refusal to marry the plaintiff—

1. That his daughter, Mrs. Langton, at Elyria, would not give her consent, and had been greatly excited over his proposed marriage.

2. That he had learned that the plaintiff had some physical infirmities which made him unwilling to marry her.

He told her that he had learned this from her friends. The evidence shows that the defendant was in fact married during his visit to Elyria, Ohio, in the month of November.

The defendant does not deny that he proposed marriage to the plaintiff at different times during the months of September and October, 1888; but he says that she at all times refused her consent, on the ground that she did not wish to marry him unless it was agreeable to his children; that all of his children except one lived in the same neighborhood, and were willing, but that Mrs. Langton, a daughter, lived at Elyria, Ohio; that the understanding between himself and plaintiff was that they should go to Ohio on an excursion; that he should there see his daughter; and that, if she consented, the marriage should then take place, but that, if she did not consent, the proposed marriage should be abandoned. He also claims that on the Sunday night preceding their trip to Ohio the plaintiff made certain statements to him in regard to the condition of her health which made him unwilling to marry her, and that he then, upon hearing her statements, expressly told her that he would not marry her. He admits that, on the trip to Ohio, he and the plaintiff occupied the same seat, and that their friends, who accompanied them, joked them more or less on their proposed marriage. He admits that at the interview with the plaintiff and her brother-in-law and Mr. Drinkall, after his return from Ohio, he denied that he was married, and gives as an excuse that he did not consider that it concerned the plaintiff whether he was married or not.

On the trial the plaintiff was allowed to testify, under objection, that certain persons had told her what defendant had said about her health; that they had told her

that defendant had told them that she had a cancer; that she had heard three different stories about her disability, which it was claimed the defendant had put in circulation. In response to the objection of defendant's counsel that this testimony was hearsay, and ought not to bind the defendant, the court said that the witness might be cross-examined to ascertain the names of the persons who had told her these things, and that the defendant might then call such persons to dispute the plaintiff, if he desired to. We cannot conceive upon what ground it could be claimed that this testimony was admissible. That it was hearsay was beyond question. Nor can I see that it comes within any of the exceptions within which hearsay evidence is sometimes admitted. The purpose and effect of the testimony was to show that the defendant had made derogatory statements of the plaintiff, calculated to bring her into ridicule and contempt; and yet the defendant may have been in no way responsible for such statements. They might have been, for all the plaintiff herself knew, but the idle or malicious gossip of the persons who made them.

There was no evidence in the case (if we except one occasion, when he was questioned by the plaintiff herself) to show that the defendant did in fact make such statements, or put into circulation any stories reflecting upon the plaintiff's physical condition; and yet the court charged the jury upon this subject as follows:

"If in this action the jury should find that he did wantonly and ruthlessly and unjustifiably break the engagement, and find that, in order to excuse himself for so doing, he made statements derogatory to her, and defamatory to her physical condition, and calculated to bring her into even greater ridicule and contempt than the mere breaking of the engagement would do, then the jury may, in the use of a sound and reasonable discretion, * * * award her damages in such measure as to punish

him for such conduct, and to deter others from such evil-doing in like cases."

It will be seen from this that the testimony last referred to was not only intended, but well calculated, under the charge of the court, to largely increase the damages which the plaintiff recovered.

On the trial the defendant's counsel asked the plaintiff, on cross-examination, whether she had not told certain lady friends (naming them) that she had a tumor. This was objected to as immaterial, and excluded. Defendant's counsel claimed the right to ask the plaintiff these questions (1) for the purpose of establishing his defense, claiming that defendant was justified in refusing to perform his contract of marriage if it appeared that the plaintiff was in a condition of health which made marriage with her unsuitable or undesirable; (2) if the plaintiff denied these statements, he claimed the right to call the persons named by him for the purpose of impeachment. The court, in excluding the testimony, did so upon the grounds:

1. That it was not admissible under the plea of the general issue,—that the defendant could not show under such plea anything in avoidance of the contract.

2. That the plaintiff could not be impeached by interrogating her upon immaterial matters, and then calling witnesses to contradict her.

In overruling the objection the court said:

"If the defendant shall testify that the plaintiff stated to him that she was incompetent because" of any physical disability, "I will then permit defendant's counsel to recall the witness for cross-examination, and allow them to lay the ground for an impeachment, * * * not in avoidance of a contract, but as going to the question whether a contract was made at all. * * * It is simply competent for the purpose of showing he didn't enter into a contract at all."

In this we think the circuit judge was in error. The

plaintiff's right to recover involves something more than a determination as to whether there was in fact a contract of marriage. It must appear that she was at the time capable of making such a contract, and of carrying it out, without fraud or injury to the defendant. If there had been no plea in the case at all, and the defendant had appeared with a right merely to cross-examine the plaintiff, he would have had a right to ask her as to her physical condition at the time the contract was entered into; and if it appeared from her own statement that she knew she was diseased, or in any way physically disqualified from entering into the marriage state, and that she concealed this fact from the defendant, it would have been a fraud upon the defendant which would prevent her recovering any, except, possibly, nominal, damages, upon the case as made by herself, and without reference to any defense.

Moreover, the plaintiff had been allowed to testify, as we have seen, to statements alleged to have been put in circulation by the defendant in regard to her physical condition. It was competent to cross-examine her as to statements she herself had made on that subject, as it might be legitimately argued that the stories in circulation were traceable to her.

Much complaint is made by the defendant of the charge of the court upon the question of damages. In actions of this kind the rule in relation to damages is a broad one. While the action is in form upon contract, the damages are governed by principles which apply to actions for personal torts. 3 Suth. Dam. 316. The rule, however, is the same as in other actions, that, unless specially averred, such damages only can be recovered as can fairly be considered as arising from the breach itself. Damages that are not the necessary consequence of the injurious act complained of are not recoverable unless specially

alleged in the declaration. I do not see that the court, in its charge to the jury, permitted the recovery of any damages which could be deemed special, or which were not recoverable under the declaration, in the general form in which they were averred. The charge upon this point was as follows:

"And, first, she is entitled to damages as compensatory damages for loss of time; for any expense she may have been put to in making preparations for marriage; for mental suffering which may have been occasioned by the breaking off of the contract; for injury to her health, if any; for loss of a permanent home, and the worldly advantages which might have been derived therefrom by her,—the circumstances as to home, property, and pecuniary condition of the defendant being considered from the evidence in the case, and her own lack of independent means, if established. She is entitled to damages to her reputation, if any, either moral or physical; for injury to her future prospects of marriage. She is entitled to damages for any humiliation, contempt, or mortification she may have suffered in the circles wherein she has moved, by reason of the breach of the contract upon defendant's part. All these she may recover by way of compensatory damages; and these she would be entitled to even if the jury should find that he broke the contract in a careful, considerate, discreet, and kindly manner."

While the facts which give rise to exemplary damages need not be specially pleaded, but such damages may be recovered as a part of the general damages in a proper case, still it must appear that there has been something more than a refusal, without sufficient legal excuse, to carry out the contract, before exemplary damages can be recovered. While it is the policy of the law to encourage marriage, it is not the policy of the law to encourage unhappy marriages.

"The marriage state ought not to be lightly entered into. It involves the profoundest interests of human life, transmitting its complex influences direct to posterity,

and invading the happiness of parents and near kindred. * * * From such a stand-point, we view the marriage engagement as a period of probation. so to speak, for both parties,—their opportunity for finding one another out; and if that probation results in developing incompatibility of tastes and temperament, coldness, suspicion, and incurable repugnance of one to the other, though all this may impute no vice to either, nor afford matter for judicial demonstration, duty requires that the match be broken off. What, then, shall be the consequence to the party who takes the initiative?"

I quote the foregoing with approval from an article by Mr. Schouler in 7 South. Law. Rev. 65. I answer that in such case the defendant should be required to pay only such damages as are strictly compensatory.

It may be said that there is very little room for sentiment in this case, where the groom is 73, and the bride 43; and yet the defendant, in selecting a wife, had a right to choose one who would be congenial and useful to him for the only purpose that, at his time of life, he could need a wife. Aside from the hearsay evidence of reports put in circulation by defendant, there was very little in the case to justify the court in its charge that exemplary damages might be awarded. It would seem that the court had that testimony in mind when giving his instructions, because it does not appear that defendant wantonly and ruthlessly broke the engagement, but that he was induced to do so by the violent opposition of his daughter. At his time of life, it was reasonable that he should be governed somewhat by the wishes of his children.

For the errors pointed out, the judgment must be reversed, and a new trial granted. We have noticed only a few of the errors assigned upon the record, calling especial attention only to such as are likely to arise on another trial. Those not noticed, so far as they are not trivial, are overruled.

CHAMPLIN, C. J., MORSE and LONG, JJ., concurred. GRANT, J., did not sit.