LEETA BENSON, Appellee, v. REX WILLIAMS, Appellant.

No. 47199.

(Reported in 32 N. W. 2d 813)

JUNE 15, 1948.

Life & Davis, of Oskaloosa, for appellant.

Palmer & Spencer, of Oskaloosa, for appellee.

SMITH, J.—That there had been an engagement to marry is, under the record, a verity. Plaintiff testifies to it and defendant, in spite of his sweeping general denial, does not in evidence deny it, but impliedly admits it.

At time of trial plaintiff was twenty-four years old and had never been married; defendant was thirty-eight and a widower with two young children, residing with his parents on a farm. At the time the engagement was entered into plaintiff was working, and had for nearly three years worked, in the Williams home. The pleadings are brief. The petition alleges:

"That about the month of December 1945 the plaintiff and defendant entered into an oral agreement to marry, but thereafter the defendant broke his promise to the plaintiff and refused to marry this plaintiff; that by reason thereof the plaintiff is damaged in the sum of five thousand ($5,000) dollars, no part of which has been paid."

The answer is even shorter:

"Comes now the defendant in the above-entitled action and denies each and every allegation of plaintiff's petition and demands strict proof thereof and requests trial of the issues of this cause by a jury."

There is little conflict in the evidence. The engagement was, at defendant's suggestion, kept secret from his parents. However, prior to January 1, 1946, it had reached the stage where the bridesmaid and minister had been spoken to and the parties had submitted to blood tests by a doctor in Oskaloosa, selected and paid for by defendant. The blood samples were sent by the doctor to Iowa City for analysis.

The parties first talked that their marriage would occur on New Year's Day but the reports from the blood tests were not back in time. The day following New Year's plaintiff learned from the doctor that the report on defendant's test was back and was all right. The next day the doctor told plaintiff that she would have to have her test taken over again because they

could not test it—"either the tube had had water in it or had been shaken too much."

Thereupon plaintiff, who was at her own parents' home by that time, advised defendant of the situation and he came to see her. He told her his folks did not approve of the marriage and that his mother had threatened to kill herself if it was consummated. "If I remember right his mother said I wasn't good enough to raise the children." He had not, before that time, told his parents of the contemplated marriage.

There was nothing determined at that time as to their future plans. They saw each other January 5th, 6th, and 9th, and again later in January. Defendant (on one of these occasions) "wanted to pay for my dress which I had purchased at Alsop's and paid about $17. I believe he spoke about me taking a trip and he would pay for it, he just wanted me to get away."

At their meeting "later in January" at plaintiff's home "he kind of thought he would like to wait again until fall. I asked him if he loved me more than his mother and he said yes. * * * I believe it was March I next saw him after that at my home. My mother was there. He wanted to drop everything then. In reply to that I said that I still thought we ought to go ahead. He said at that time it was all over between us."

In the foregoing we have followed the testimony of plaintiff. She says that when she told defendant about the doctor's report they talked "with regard to having another blood test. * * * He hadn't made up his mind for sure whether he wanted to go ahead with it or not. * * * I thought maybe we might go to Iowa City the next day to take a blood test * * *. He didn't come right out and say anything as to that * * *. I don't just remember exactly what he said after I told him I would go to Iowa City to have another blood test taken but then he thought we should wait. He didn't want to get married while his folks felt the way they did. We didn't plan to have another blood test taken until we found out how his parents were going to act. He told me to wait awhile and see how things were going to come out and that we would have another one taken."

At their March 23d conversation plaintiff says:

"I asked him something about going with another girl * * *.

He told me he had been seeing her and that he had a date with her" for the following Sunday night. "I felt badly that the marriage was off. I cried about it after I went into the house."

It is to be said further in connection with plaintiff's testimony concerning this March conversation that on cross-examination she testified:

"Q. And I think you stated that * * * Rex * * * said that he wanted to drop everything? A. In March he did, yes. Q. And: you said to him at that time that that was all right? A. Well, it had to be all right. Q. You said to him it was all right, didn't you girl, in that conversation to him at that time? A. Well, I suppose I did."

Defendant does not deny plaintiff's testimony except that he says plaintiff never asked him to take her to Iowa City or signified any willingness to take another blood test. He admits his parents' opposition to the marriage and says his mother told him: "If you knew what I know about her that she has told me, you wouldn't want to marry her either." He says plaintiff told him "something was· wrong" with the blood specimen. He admits she told him the doctor said "it had been damaged in transit or that it couldn't be tested." He also says:

"I didn't understand that it had come out positive and she was not eligible to marry * * *. I never asked her to have another one taken. It was not because my parents [were] opposed to the marriage. After the test came back I felt that I had a little ground that I might not want to go ahead with it."

We have set out the testimony at some length in order to furnish the background of defendant's contentions on the trial and on this appeal. The jury returned a verdict against defendant for $2,500 and he appeals from the resultant judgment.

Most of the errors he assigns and argues are related to appellant's fundamental misconception of the effect of the Iowa statute requiring physician's certificate as to freedom of both parties from syphilis before issuing a marriage license (chapter 596, Code, 1946) ; the others pertain to the question of damages and alleged misconduct of plaintiff's attorney in final argument to the jury.

█ I. At the close of plaintiff's case defendant moved for a directed verdict, contending that plaintiff had not shown herself "competent and capable of establishing a complete and binding contract to marry." The motion was overruled and not renewed at the close of all the evidence.

However, a similar contention was made by requests for instructions which would have been in effect a direction. They were denied by the trial court. The theory underlying this contention is that since the statute requires a physician's certificate showing both parties to be free from syphilis (as a condition precedent to issuance of the license) and since no such certificate was procured by plaintiff, she could not recover in this action. The argument assumes that this statute becomes a part of every contract to marry and that as a condition precedent to recovery in this action plaintiff had to produce such certificate.

Plaintiff's petition did not allege her competency in that respect. No attack was made on it by defendant on that ground. He pleaded a mere general denial. This probably is a complete answer to his contention here. If the burden was on plaintiff to prove her competency she should have pleaded it. In that case her failure to so plead would have rendered her petition vulnerable to attack and failure to attack by an appropriate motion would waive the defect. Advantage could not be first taken of it by request for instructions. Dunn v. Wolf, 81 Iowa 688, 690, 47 N. W. 887; Clark v. Ross, 96 Iowa 402, 407, 65 N. W. 340.

But the whole discussion misconceives the legal effect of the statute. It does not become a part of the engagement contract. By that contract neither party makes any representation as to his ability to procure a doctor's certificate, nor need plaintiff in an action of this kind, plead or assume the burden of proving his ability to qualify for a marriage license under it. If it develop that either party cannot so qualify probably that would justify the other in terminating the engagement. But surely in such an event, in a resulting action for breach of promise, the burden of pleading and proof of the fact would be upon the defendant who relied on it as such justification.

We find no enlightening decision under our own or any comparable statute. Nor do we find, nor is there cited to us, any

very helpful authority upon which to base a conclusion. In Vierling v. Binder, 113 Iowa 337, 340, 85 N. W. 621, 622, defendant attempted to contend (without pleading it as a defense) that plaintiff's physical condition was such as to constitute a bar to the action for breach of the alleged promise to marry. We held "the matter should have been pleaded by way of confession and avoidance" and could not be first raised by request for instructions. That, of course, was not entirely similar to the present situation. Yet the decision is in point. The contention there involved physical condition that would incapacitate plaintiff for the marriage state. The contention here is that plaintiff failed to furnish statutory proof of freedom from a disease that would unfit her for a legal marriage. There is an analogy between the two cases. We think in either the defense would have to be pleaded in avoidance. See Welker v. Wallace, 117 Wash. 52, 200 P. 561; 8 Am. Jur., Breach of Promise of Marriage, section 36. We find an old Michigan case which might be cited to the contrary (Goddard v. Westcott, 82 Mich. 180, 46 N. W. 242) but do not deem that decision persuasive.

It should be made clear there is no suggestion here that plaintiff's blood would have failed to meet the statutory test. Due to no fault of her own there was no test made. Defendant, in his testimony disclaims any idea that she "was not eligible to marry." He understood her blood sample "had been damaged in transit or that it couldn't be tested." He first postponed and then called off the engagement because "I felt that I had a little ground that I might not want to go ahead with it."

 II. Defendant on appeal urges the evidence did not show he breached the contract. What we have stated of the evidence leaves no doubt that this issue was for the jury.

The statute we have referred to provides: "* * * all persons making application for license to marry shall, at any time within twenty days prior to such application, be examined by a duly licensed physician in this state as to the existence of or freedom from syphilis * * *" and makes it unlawful for the clerk to issue the license unless a certificate of the favorable result of such a test is presented. Section 596.1, Iowa Code, 1946. A subsequent Code section prescribes penalties for violation of this provision. Section 596.6.

There is evidence here to support a finding that when it was discovered plaintiff's blood test had not been made, postponement and delay resulted because of defendant's reluctance to proceed in face of parental objection. After twenty days had elapsed it was just as necessary for. defendant as for plaintiff to submit again to test. Yet there is no evidence he ever proposed or consented to a retest of his own blood or of hers. It might be inferred he had already decided to terminate the engagement. There is dispute in the record as to whether plaintiff affirmatively proposed going forward with the test. However, her testimony is undenied that he said in March, "it is all over between us." The testimony of plaintiff's mother, undenied by defendant, is that on February 8th he wanted her to influence her daughter to abandon the engagement. Whether defendant was guilty of breach of the contract was clearly a question of fact for the jury under this record.

█ III. Based upon the part of plaintiff's cross-examination we have already quoted relating to the March 23d conversation, defendant argues the contract had been rescinded "by the mutual act and consent" of the parties. We do not so interpret her testimony. However, there was no such defense pleaded and it seems first to have been urged in the motion for judgment notwithstanding the verdict. We cannot consider it on appeal. See 8 Am. Jur., Breach of Promise of Marriage, section 36; Salchert v. Reinig, 135 Wis. 194, 115 N. W. 132, 135.

█ IV. Some complaint is made that defendant was unduly restricted in his cross-examination of plaintiff as to the fact no blood test certificate had been furnished by her and the circumstances and consequences attending that situation. Details of that part of the cross-examination cover many pages of the record. Some questions were permitted and others ruled out on objection.

It is impracticable to quote the record in full and impossible fairly to condense it within any reasonable limits. We have examined it carefully and conclude there was no undue limitation on the cross-examination. Much of it was based on defendant's erroneous theory of the effect of the statute on plaintiff's right to maintain the action in view of the fact that her test

had not been made and on the assumption that such fact was a material issue in the case.

Under the issues as made by the pleadings the question of blood test was purely incidental. The facts were of course brought out on direct examination as a part of the narrative. But they were quite immaterial otherwise. Defendant was permitted to go as far as he was reasonably entitled to go on cross-examination under the circumstances. There was no error in the rulings.

V. Defendant moved to withdraw from the consideration of the jury all questions of damage except as to one item representing a $17.50 dress purchased by plaintiff. On appeal he contends the court erred in overruling it and that there was no showing of injury to plaintiff's health or of any embarrassment or humiliation after March 23, 1946, the date when defendant definitely announced it was all over between them. His argument is that if there was any breach by defendant it did not occur until that date and that there was no evidence of embarrassment and humiliation thereafter.

We are not impressed by the argument. The final word on March 23d could under the evidence be deemed merely the culmination of a campaign of delay and neglect on defendant's part, designed to terminate the engagement. We cannot fix the exact date of breach. Whatever embarrassment and humiliation plaintiff suffered during the period of delay before defendant's final announcement could be found to be a part of the damages recoverable if the jury found defendant guilty of breach.

There was no error in overruling the motion.

VI. One more contention demands our consideration. It is argued the verdict is the result of passion and prejudice excited by the final argument to the jury on behalf of plaintiff. Two objections were made during the course of this argument. Defendant's argument to which it was a reply is not shown in the record.

The first interruption of the final argument occurred as plaintiff's counsel asserted defendant's attorney had in argument inferred there was something physically wrong with plaintiff which caused the rejection of her blood sample and the failure thereafter to consult a doctor. Defendant's attorney

promptly denied having drawn such inference. The court merely admonished "stick to the record," and the argument proceeded. Without having the preceding argument before us we cannot say there was error. If plaintiff's criticism was unjust we assume the jury could detect its unfairness.

The second objection was made as plaintiff's counsel, allegedly in reply to defendant's counsel, stated that defendant might have called the doctor to the stand. (It had been stipulated at the close of plaintiff's case that a subpoena had issued that morning but had not been served because the doctor was in Des Moines.) Defendant's attorney objected on the ground the doctor's testimony would have been privileged and only plaintiff could waive it. Plaintiff's attorney retorted that defendant sent plaintiff to the doctor. The resulting courtroom picture is familiar to us all. The trial court cut the dialogue short by ordering "Proceed with the argument." We need not determine which contention was correct. See, however, Woods v. Incorporated Town of Lisbon, 150 Iowa 433, 435, 130 N. W. 372.

Assuming, without holding, that the argument was improper we find nothing in it calculated to arouse passion and prejudice in the minds of the jurors. Nor is there indication in the size of the verdict, or in the testimony bearing on the subject of damages, that the jurors were under any such influence.

What we have said disposes of the various assignments urged on defendant's behalf. We find no reversible error and the judgment of the trial court is affirmed.—Affirmed.

MULRONEY, C. J., and OLIVER, BLISS, HALE, GARFIELD, WENNERSTRUM, MANTZ, and HAYS, JJ., concur.