### In re the MARRIAGE OF Arthur Lee WITTEN III and Tamera Jean Witten,

### Upon the Petition of Arthur Lee Witten III, Appellee,

### and

### Concerning Tamera Jean Witten, Appellant.

### No. 03–0551.

Supreme Court of Iowa.

Dec. 17, 2003.

---

Julie A. Schumacher of Mundt, Franck & Schumacher, Denison, for appellant.

Reed H. Reitz of Reimer, Lohman & Reitz, Denison, for appellee.

TERNUS, Justice.

The primary issue raised on appeal of the district court's decree in this dissolution action is whether the court properly determined the rights of Arthur (known as Trip) and Tamera Witten with respect to the parties' frozen human embryos stored

at a medical facility. While we agree with Tamera that the informed consent signed by the parties at the request of the medical facility does not control the current dispute between the donors over the use or disposition of the embryos, we reject Tamera's request that she be allowed to use the embryos over Trip's objection. Therefore, we affirm the trial court's order that neither party may use or dispose of the embryos without the consent of the other party.

On Trip's cross-appeal, we modify the court's property division, eliminating the cash payment from Trip to Tamera and substituting an equivalent portion of Trip's retirement account. We affirm the trial court's award of trial attorney fees to Tamera, a matter also challenged on Trip's cross-appeal.

## I. *Background Facts and Proceedings.*

The appellee, Arthur (Trip) Witten, and the appellant, Tamera Witten, had been married for approximately seven and one-half years when Trip sought to have their marriage dissolved in April 2002. One of the contested issues at trial was control of the parties' frozen embryos. During the parties' marriage they had tried to become parents through the process of in vitro fertilization. Because Tamera was unable to conceive children naturally, they had eggs taken from Tamera artificially fertilized with Trip's sperm. Tamera then underwent several unsuccessful embryo transfers in an attempt to become pregnant. At the time of trial seventeen fertilized eggs remained in storage at the University of Nebraska Medical Center (UNMC).[1]

Prior to commencing the process for in vitro fertilization, the parties signed informed consent documents prepared by the medical center. These documents included an "Embryo Storage Agreement," which was signed by Tamera and Trip as well as by a representative of UNMC. It provided in part:

> Release of Embryos. The Client Depositors [Trip and Tamera] understand and agree that containers of embryos stored pursuant to this agreement will be used for transfer, release or disposition only with the signed approval of both Client Depositors. UNMC will release the containers of embryos only to a licensed physician recipient of written authorization of the Client Depositors.

The agreement had one exception to the joint-approval requirement that governed the disposition of the embryos upon the death of one or both of the client depositors. Another provision of the contract provided for termination of UNMC's responsibility to store the embryos upon several contingencies: (1) the client depositors' written authorization to release the embryos or to destroy them; (2) the death of the client depositors; (3) the failure of the client depositors to pay the annual storage fee; or (4) the expiration of ten years from the date of the agreement.

At trial, Tamera asked that she be awarded "custody" of the embryos. She wanted to have the embryos implanted in her or a surrogate mother in an effort to bear a genetically linked child. She testified that upon a successful pregnancy she would afford Trip the opportunity to exercise parental rights or to have his rights terminated. She adamantly opposed any

---

**1.** No medical testimony was introduced at trial with respect to the cell stage of the parties' fertilized eggs. Therefore, while some cases refer to fertilized eggs in the early stages of division as "pre-zygotes" or "preembryos," we use the term "embryo" in discussing the present appeal, since that is the terminology used in the Wittens' contract with UNMC. This term is used interchangeably with the term "fertilized egg."

destruction of the embryos, and was also unwilling to donate the eggs to another couple.

Trip testified at the trial that while he did not want the embryos destroyed, he did not want Tamera to use them. He would not oppose donating the embryos for use by another couple. Trip asked the court to enter a permanent injunction prohibiting either party from transferring, releasing, or utilizing the embryos without the written consent of both parties.

The district court decided the dispute should be governed by the "embryo storage agreement" between the parties and UNMC, which required both parties' consent to any use or disposition of the embryos. Enforcing this agreement, the trial court enjoined both parties "from transferring, releasing or in any other way using or disposing of the embryos ... without the written and signed approval and authorization" of the other party.

Tamera has appealed the trial court's order, challenging only the court's resolution of the parties' dispute over the fertilized eggs. She claims the storage agreement is silent with respect to disposition or use of the embryos upon the parties' dissolution because there is no provision specifically addressing that contingency. Therefore, she argues, the court should have applied the "best interests" test of Iowa Code chapter 598 (2001) and, pursuant to that analysis, awarded custody of the embryos to her. She makes the alternative argument that she is entitled to the fertilized eggs due to her fundamental right to bear children. Finally, Tamera claims it would violate the public policy of this state if Trip were allowed to back out of his agreement to have children. She claims such an agreement is evidenced by his participation in the in vitro fertilization procedure.

Trip has filed a cross-appeal. He claims the court erred in awarding Tamera a cash payment to equalize the property division rather than simply awarding her a share of his retirement account. He also contends the trial court abused its discretion in ordering Trip to pay $1000 toward Tamera's attorney fees.

II. *Scope of Review.*

▆▆▆▆ We review claimed error in dissolution-of-marriage decrees de novo. *See In re Marriage of Knickerbocker*, 601 N.W.2d 48, 50–51 (Iowa 1999). Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses. *Id.* at 51. An award of attorney fees is reviewed for an abuse of discretion. *See In re Marriage of Benson,* 545 N.W.2d 252, 258 (Iowa 1996).

III. *Disposition of Embryos.*

▆▆▆ A. *Scope of storage agreement.* We first consider Tamera's contention that the storage agreement does not address the situation at hand. As noted earlier, the agreement had a specific provision governing control of the embryos if one or both parties died, but did not explicitly deal with the possibility of divorce. Nonetheless, we think the present predicament falls within the general provision governing "release of embryos," in which the parties agreed that the embryos would not be transferred, released, or discarded without "the signed approval" of both Tamera and Trip. This provision is certainly broad enough to encompass the decision-making protocol when the parties are unmarried as well as when they are married.

The only question, then, is whether such agreements are enforceable when one of the parties later changes his or her mind

with respect to the proper disposition of the embryos. In reviewing the scarce case law from other jurisdictions on this point, we have found differing views of how the parties' rights should be determined. There is, however, abundant literature that has scrutinized the approaches taken to date. Some writers have suggested refinements of the analytical framework employed by the courts thus far; some have proposed an entirely new model of analysis. From these various sources, we have identified three primary approaches to resolving disputes over the disposition of frozen embryos, which we have identified as (1) the contractual approach, (2) the contemporaneous mutual consent model, and (3) the balancing test.

Tamera's argument that her right to bear children should override the parties' prior agreement as well as Trip's current opposition to her use of the embryos resembles the balancing test. As for Tamera's alternative argument, we have found no authority supporting a "best interests" analysis in determining the disposition of frozen embryos. Nonetheless, we will first consider whether chapter 598 requires application of that analysis under the circumstances presented by this case. Then, we will discuss and consider the three approaches suggested by decisions from other jurisdictions and the literature on this subject.

B. *"Best interests" test.* Iowa Code section 598.41 sets forth various standards governing a court's determination of the custody of the parties' children in a dissolution case, including the requirement that any custody award reflect "the best interest of the child." Tamera contends the embryos are children and their best interest demands placement with her. Trip argues the frozen embryos are not children and should not be considered as such for purposes of applying chapter 598 in dissolution actions.

In resolving this disagreement, we note initially that we are not called upon to determine the religious or philosophical status of the fertilized eggs. *See generally* Carl H. Coleman, *Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes,* 84 Minn. L.Rev. 55, 66–68 (1999) (noting three main views regarding the "moral status" of the human embryo) [hereinafter "Coleman"]. Rather, we are merely required to decide whether the embryos have the *legal* status of children under our dissolution-of-marriage statute.

Our first step is to consider the legislature's definition of "child" as that term is used in chapter 598. The term "minor child" is defined in section 598.1(6) as "any *person* under legal age." Iowa Code § 598.1(6) (emphasis added). Whether frozen embryos fall within this definition is an issue of first impression for this court.

While we have not considered the legal status of frozen embryos before, our court has had the opportunity to determine whether an unborn fetus is a "person" or a "child" in the context of other statutory provisions. *See Dunn v. Rose Way, Inc.,* 333 N.W.2d 830, 833 (Iowa 1983); *Weitl v. Moes,* 311 N.W.2d 259, 273 (Iowa 1981), *overruled on other grounds by Audubon–Exira Ready Mix, Inc. v. Ill. Cent. Gulf R.R.,* 335 N.W.2d 148, 152 (Iowa 1983); *McKillip v. Zimmerman,* 191 N.W.2d 706, 709 (Iowa 1971); *cf. Craig v. IMT Ins. Co.,* 407 N.W.2d 584, 587–88 (Iowa 1987) (permitting recovery under uninsured motorist coverage by husband and wife for death of their viable, unborn fetus on basis that fetus was a "covered person" under policy). In the *Weitl* and *McKillip* cases, this court considered whether an unborn fetus, viable in *Weitl* and nonviable in *McKillip,* was a "person" within the mean-

ing of Iowa's survival statute. *See Weitl,* 311 N.W.2d at 270 (interpreting Iowa Code section 611.20); *McKillip,* 191 N.W.2d at 708 (same). Noting in *McKillip* that we "express[ed] no opinion as to the existence of the fetus as a person in either the philosophical or actual sense," we held the word "person" as used in the statute meant "only those born alive." *McKillip,* 191 N.W.2d at 709; *accord Weitl,* 311 N.W.2d at 271 (holding "[t]he ordinary meaning of the word 'person' is a human being who has 'attained a recognized individual identity' by being born alive" (citation omitted)).

We reached a seemingly inconsistent result in *Dunn,* in which we considered the scope of the phrase "death of a minor child" as used in then rule 8 (now Iowa Rule of Civil Procedure 1.206). 333 N.W.2d at 831. In that case, we were called upon to decide whether a parent could recover under the rule for damages resulting from the death of the plaintiff's unborn child in an automobile accident. *Id.* No statutory definition of the term "minor child" guided our analysis. We also found little assistance in linguistic arguments, observing whether the term "minor child" included the unborn depended on which dictionary was consulted. *Id.* at 833. Consequently, "set[ting] completely aside all the philosophical arguments about the status of the unborn," we based our decision "on the rule's purpose." *Id.* Noting the purpose of the rule was to permit parents to recover "when they are deprived of the anticipated services, companionship, and society of a minor child," we concluded a parent's "deprivation [did] not necessarily relate to the child's birth." *Id.* We held, therefore, that the parent's right of recovery should "not depend on the legal status of the child" and recovery under rule 8 was permissible even when the deceased "child" was an unborn fetus. *Id.*

The common denominator in all three of our cases that consider the legal status of a fetus is our focus on the purpose of the law at issue and the legislative intent reflected by that purpose. *See Dunn,* 333 N.W.2d at 833 ("In the final analysis the question must turn on the rule's purpose."); *Weitl,* 311 N.W.2d at 273 (stating, "our role is to construe the statute as we believe the legislature intended it"); *McKillip,* 191 N.W.2d at 708 ("The pointed question is—Was the fetus a 'person,' as that term was used by the legislature in enacting section 611.20. . . ."). That is the approach we follow in deciding the issue in this case. Therefore, rather than relying on our prior cases involving different statutes, we center our attention on the legislative intent with respect to the statute at issue here.

■ With this focus in mind, we conclude the principles contained in section 598.41 do not govern the dispute before us. First, we note the purposes of the "best interest" standard set forth in that statute are to "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents" and to "encourage parents to share the rights and responsibilities of raising the child." Iowa Code § 598.41(1)(*a* ). The principles developed under this statute are simply not suited to the resolution of disputes over the control of frozen embryos. Such disputes do not involve maximizing physical and emotional contact between both parents and the child; they involve the more fundamental decision of whether the parties will be parents at all. Moreover, it would be premature to consider which parent can most effectively raise the child when the "child" is still frozen in a storage facility.

The principles of section 598.41 do not fit because what is really at issue here is

not the custody of children as that concept is generally viewed and analyzed in dissolution cases. Rather, the issue here is who will have decision-making authority with respect to the fertilized eggs. *See generally Kass v. Kass,* 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 179 (1998) (noting "the relevant inquiry" in disputes over control of frozen "pre-zygotes" is "who has dispositional authority over them"); *Davis v. Davis,* 842 S.W.2d 588, 597 (Tenn.1992) (holding, in dissolution-of-marriage action, that fertilized eggs were neither "persons" nor "property" for purposes of determining the parties' "decision-making authority concerning disposition of the embryos" and implicitly rejecting "best interests" analysis used by trial court). Thus, the factors that are relevant in determining the custody of children in dissolution cases are simply not useful in determining how decisions will be made with respect to the disposition and use of a divorced couple's fertilized eggs. For these reasons, we conclude the legislature did not intend to include fertilized eggs or frozen embryos within the scope of section 598.41.

C. *Enforcement of storage agreement.* We now consider the appropriateness of the trial court's decision to allow Tamera and Trip's agreement with the medical center to control the current dispute between them. As we noted above, there are three methods of analysis that have been suggested to resolve disputes over frozen embryos. We will discuss them separately.

1. *Contractual approach.* The currently prevailing view—expressed in three states—is that contracts entered into at the time of in vitro fertilization are enforceable so long as they do not violate public policy. *See Kass,* 673 N.Y.S.2d 350, 696 N.E.2d at 180 (stating agreements between donors "regarding disposition of pre-zygotes should generally be presumed valid and binding"); *Davis,* 842 S.W.2d at 597 (holding agreement regarding disposition of embryos "should be considered binding"); *In re Litowitz,* 146 Wash.2d 514, 48 P.3d 261, 271 (2002) (enforcing parties' contract providing for disposition of preembryos after five years of storage).[2] The New York Court of Appeals expressed the following rationale for this contractual approach:

> [It is] particularly important that courts seek to honor the parties' expressions of choice, made before disputes erupt, with the parties' over-all direction always uppermost in the analysis. Knowing that advance agreements will be enforced underscores the seriousness and integrity of the consent process. Advance agree-

---

**2.** Application of the contractual approach in *Kass* resulted in enforcement of the parties' agreement that the fertilized eggs would be donated for research should the parties be "unable to make a decision regarding the disposition of [the] stored, frozen pre-zygotes." 696 N.E.2d at 176–77, 181. In *Litowitz,* the court permitted execution of the parties' previous agreement that the preembryos would be "disposed of" after five years. 48 P.3d at 271. The resolution of the divorcing couple's dispute was more complex in *Davis* because the parties did not have a contract addressing the disposition of any unused preembryos. 842 S.W.2d at 590. Noting that a "prior agreement concerning disposition

should be carried out," the court concluded in the absence of such an agreement, "the relative interests of the parties in using or not using the preembryos must be weighed." *Id.* at 604. The court awarded the preembryos to the husband, concluding his interest in not becoming a parent outweighed his former wife's interest in donating the preembryos to another couple for implantation. *Id.* The court noted the issue might be closer if the wife had wanted to use the preembryos herself; but in view of the fact she had "a reasonable possibility of achieving parenthood by means other than use of the preembryos in question," she would not have prevailed even under those circumstances. *Id.*

ments as to disposition would have little purpose if they were enforceable only in the event the parties continued to agree. To the extent possible, it should be the progenitors—not the State and not the courts—who by their prior directive make this deeply personal life choice. *Kass*, 673 N.Y.S.2d 350, 696 N.E.2d at 180.

This approach has been criticized, however, because it "insufficiently protects the individual and societal interests at stake":

> First, decisions about the disposition of frozen embryos implicate rights central to individual identity. On matters of such fundamental personal importance, individuals are entitled to make decisions consistent with their contemporaneous wishes, values, and beliefs. Second, requiring couples to make binding decisions about the future use of their frozen embryos ignores the difficulty of predicting one's future response to life-altering events such as parenthood. Third, conditioning the provision of infertility treatment on the execution of binding disposition agreements is coercive and calls into question the authenticity of the couple's original choice. Finally, treating couples' decisions about the future use of their frozen embryos as binding contracts undermines important values about families, reproduction, and the strength of genetic ties.

Coleman, 84 Minn. L.Rev. at 88–89. Another legal writer has echoed these concerns:

> Binding a couple to a prior disposition agreement has its roots in contract law. The primary advantage of treating the disposition of preembryos as a contract dispute is that it binds individuals to previous obligations, even if their priorities or values change. This advantage, while maximizing the efficiency of commercial transactions, is ill-suited to govern the disposition of human tissue with

the potential to develop into a child. The potential of the embryo requires that couples be allowed to make contemporaneous decisions about the fate of the embryo that reflect their current values.

Christina C. Lawrence, Note, *Procreative Liberty and the Preembryo Problem: Developing a Medical and Legal Framework to Settle the Disposition of Frozen Embryos*, 52 Case W. Res. L.Rev. 721, 729 (2002) [hereinafter "Lawrence Note"]; *accord J.B. v. M.B.*, 170 N.J. 9, 783 A.2d 707, 718–19 (2001). In response to such concerns, one commentator has suggested an alternative model requiring contemporaneous mutual consent. We now examine that approach.

2. *Contemporaneous mutual consent.* The contractual approach and the contemporaneous mutual consent model share an underlying premise: "decisions about the disposition of frozen embryos belong to the couple that created the embryo, with each partner entitled to an equal say in how the embryos should be disposed." Coleman, 84 Minn. L.Rev. at 81. Departing from this common starting point, the alternative framework asserts the important question is "at what time does the partners' consent matter?" *Id.* at 91. Proponents of the mutual-consent approach suggest that, with respect to "decisions about intensely emotional matters, where people act more on the basis of feeling and instinct than rational deliberation," it may "be impossible to make a knowing and intelligent decision to relinquish a right in advance of the time the right is to be exercised." *Id.* at 98; *see also* Sara D. Petersen, Comment, *Dealing With Cryopreserved Embryos Upon Divorce: A Contractual Approach Aimed at Preserving Party Expectations*, 50 UCLA L.Rev. 1065, 1090 & n. 156 (2003) (stating "surveys of couples that have stored frozen embryos suggest that they may be prone to changing their minds

while their embryos remain frozen" and citing a study that found " '[o]f the 41 couples that had recorded both a pre-treatment and post-treatment decision about embryo disposition, only 12(29%) kept the same disposition choice' " (citation omitted)). One's erroneous prediction of how she or he will feel about the matter at some point in the future can have grave repercussions. "Like decisions about marriage or relinquishing a child for adoption, decisions about the use of one's reproductive capacity have lifelong consequences for a person's identity and sense of self":

> When chosen voluntarily, becoming a parent can be an important act of self-definition. Compelled parenthood, by contrast, imposes an unwanted identity on the individual, forcing her to redefine herself, her place in the world, and the legacy she will leave after she dies. For some people, the mandatory destruction of an embryo can have equally profound consequences, particularly for those who believe that embryos are persons. If forced destruction is experienced as the loss of a child, it can lead to life-altering feelings of mourning, guilt, and regret.

Coleman, 84 Minn. L.Rev. at 96–97. To accommodate these concerns, advocates of the mutual-consent model propose "no embryo should be used by either partner, donated to another patient, used in research, or destroyed without the [contemporaneous] mutual consent of the couple that created the embryo." *Id.* at 110. Under this alternate framework,

> advance instructions would not be treated as binding contracts. If either partner has a change of mind about disposition decisions made in advance, that person's current objection would take precedence over the prior consent. If one of the partners rescinds an advance disposition decision and the other does not, the mutual consent principle would

not be satisfied and the previously agreed-upon disposition decision could not be carried out.

> . . . .

> When the couple is unable to agree to any disposition decision, the most appropriate solution is to keep the embryos where they are—in frozen storage. Unlike the other possible disposition decisions—use by one partner, donation to another patient, donation to research, or destruction—keeping the embryos frozen is not final and irrevocable. By preserving the status quo, it makes it possible for the partners to reach an agreement at a later time.

*Id.* at 110–12; *see also id.* at 89 (suggesting "the embryo would remain in frozen storage until the parties reach a new agreement, the embryo is no longer viable, or storage facilities are no longer available"); *accord* Lawrence Note, 52 Case W. Res. L.Rev. at 742. Although this model precludes one party's use of the embryos to have children over the objection of the other party, the outcome under the contractual approach and the balancing test would generally be the same. *See A.Z. v. B.Z.*, 431 Mass. 150, 725 N.E.2d 1051, 1057–58 (2000) ("As a matter of public policy, . . . forced procreation is not an area amenable to judicial enforcement."); *J.B.*, 783 A.2d at 717 (evaluating relative interests of parties in disposition of embryos, concluding husband should not be able to use embryos over wife's objection); *Davis*, 842 S.W.2d at 604 ("Ordinarily, the party wishing to avoid procreation should prevail."); Susan B. Apel, *Disposition of Frozen Embryos: Are Contracts the Solution?*, Vermont Bar Journal, March 2001, at 31 ("Some argue that the party seeking to avoid procreation should prevail, and indeed, this appears to be the one harmonizing rationale of the four reported cases.") [hereinafter "Apel"].

3. *Balancing test.* The New Jersey Supreme Court appears to have adopted an analysis regarding the disposition of frozen human embryos that incorporates the idea of contemporaneous decision-making, but not that of mutual consent. In *J.B.*, the New Jersey court rejected the *Kass* and *Davis* contractual approach, noting public policy concerns in "[e]nforcement of a contract that would allow the implantation of preembryos at some future date in a case where one party has reconsidered his or her earlier acquiescence." 783 A.2d at 718. The court stated:

> We believe that the better rule, and the one we adopt, is to enforce agreements entered into at the time in vitro fertilization is begun, *subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored preembryos.*

*Id.* at 719 (emphasis added). The court based its decision on "[t]he public policy concerns that underlie limitations on contracts involving family relationships." *Id.;* see also A.Z., 725 N.E.2d at 1057–58 (refusing, in light of the same public policy concerns, to enforce an agreement that allowed the wife, upon the parties' separation, to use the couple's preembryos for implantation).

The New Jersey court did not, however, adopt the requirement for mutual consent as a prerequisite for any use or disposition of the preembryos. Rather, that court stated that "if there is a disagreement between the parties as to disposition . . ., the interests of both parties must be evaluated" by the court. *J.B.*, 783 A.2d at 719. This balancing test was also the default analysis employed by the Tennessee Supreme Court in *Davis* where the parties had not executed a written agreement. *See Davis*, 842 S.W.2d at 604 (holding in the absence of a prior agreement concerning disposition, "the relative interests of the parties in using or not using the preembryos must be weighed" by the court).

The obvious problem with the balancing test model is its internal inconsistency. *See generally* Lawrence Note, 52 Case W. Res. L.Rev. at 738 (suggesting "[t]he premise of the balancing test . . . is flawed"). Public policy concerns similar to those that prompt courts to refrain from enforcement of contracts addressing reproductive choice demand even more strongly that we not substitute the courts as decision makers in this highly emotional and personal area. Nonetheless, that is exactly what happens under the decisional framework based on the balancing test because the court must weigh the relative interests of the parties in deciding the disposition of embryos when the parties cannot agree. *See J.B.*, 783 A.2d at 719.

D. *Discussion.* With these alternative approaches in mind, we turn to the present case. Trip asks that the contractual provision requiring mutual consent be enforced; Tamera claims this agreement is against the public policy of Iowa because it allows Trip to back out of his prior agreement to become a parent. We first consider whether there is any merit to Tamera's public policy argument.

▪▪▪ "While the term 'public policy' is not susceptible of exact definition," *Walker v. Am. Family Mut. Ins. Co.*, 340 N.W.2d 599, 601 (Iowa 1983), we think the following discussion captures the meaning of this phrase:

> The term "public policy" is of indefinite and uncertain definition, and there is no absolute rule or test by which it can be always determined whether a contract contravenes the public policy of the state; but each case must be determined according to the terms of the instrument under consideration and the circumstances peculiar thereto. In general,

however, it may be said that any contract which conflicts with the morals of the times or contravenes any established interest of society is contrary to public policy. We must look to the Constitution, statutes, and judicial decisions of the state, to determine its public policy and that which is not prohibited by statute, condemned by judicial decision, nor contrary to the public morals contravenes no principle of public policy.

*Liggett v. Shriver,* 181 Iowa 260, 265, 164 N.W. 611, 612–13 (1917); *accord Wunschel Law Firm, P.C. v. Clabaugh,* 291 N.W.2d 331, 335 (Iowa 1980). The identification of a public policy is only part of the equation, however. "To strike down a contract on public policy grounds, we must conclude that 'the preservation of the general public welfare ... outweigh[s] the weighty societal interest in the freedom of contract.' " *Grinnell Mut. Reinsurance Co. v. Jungling,* 654 N.W.2d 530, 540 (Iowa 2002)(citation omitted). In consideration of the delicate balancing required in this arena, we exercise the power to invalidate a contract on public policy grounds cautiously and only in cases free from doubt. *DeVetter v. Principal Mut. Life Ins. Co.,* 516 N.W.2d 792, 794 (Iowa 1994).

▪ Tamera contends the contract at issue here violates public policy because it allows a person who has agreed to participate in an in vitro fertilization program to later change his mind about becoming a parent. While there is some question whether Trip's participation constitutes an implied agreement to become a father, *see Davis,* 842 S.W.2d at 598 (rejecting argument that husband impliedly agreed to become a parent outside the confines of a marital relationship simply by undergoing in vitro fertilization procedures with his then wife), we accept Tamera's assertion for purposes of the present discussion and proceed to consider whether there is any public policy against an agreement allowing a donor to abandon in vitro fertilization attempts when viable embryos remain. Tamera cites to no Iowa statute or prior case that articulates such a policy in the factual context we face here. While Iowa statutes clearly impose responsibilities on parents for the support and safekeeping of their children, such statutes, as we have already discussed in connection with chapter 598, do not contemplate the complex issues surrounding the disposition and use of frozen human embryos. The public policy evidenced by our law relates to the State's concern for the physical, emotional, and psychological well being of children who have been born, not fertilized eggs that have not even resulted in a pregnancy.

Nor can we say that the "morals of the times" are such that a party participating in an in vitro fertilization process has the duty to use or facilitate the use of each fertilized egg for purposes of pregnancy. To the contrary, courts that have considered one party's desire to use frozen embryos over the objection of the other progenitor have held that the objecting party's fundamental right not to procreate outweighs the other party's procreative rights, even in the face of a prior agreement allowing one party to use the embryos upon the parties' divorce. *See A.Z.,* 725 N.E.2d at 1057–58; *J.B.,* 783 A.2d at 717–19. Thus, we find no public policy that requires the use of the frozen embryos over one party's objection.

▪ That brings us to the more complex issue: are prior agreements regarding the future disposition of embryos enforceable when one of the donors is no longer comfortable with his or her prior decision? We first note our agreement with other courts considering such matters that the partners who created the embryos

have the primary, and equal, decision-making authority with respect to the use or disposition of their embryos. We think, however, that it would be against the public policy of this state to enforce a prior agreement between the parties in this highly personal area of reproductive choice when one of the parties has changed his or her mind concerning the disposition or use of the embryos.

Our statutes and case law evidence an understanding that decisions involving marital and family relationships are emotional and subject to change. For example, Iowa law imposes a seventy-two hour waiting period after the birth of a child before the biological parents can release parental rights. *See* Iowa Code § 600A.4(2)(*g* ). In addition, although this court has not abolished claims for breach of promise to marry,[3] only recovery of monetary damages is permitted; the court will not force a party to actually consummate the marriage. *See* Herbert F. Goodrich, *Iowa Decisions on Breach of Marriage Promise*, 4 Iowa L. Bull. 166, 177 (1918). It has also long been recognized in this state that agreements for the purpose of bringing about a dissolution of marriage are contrary to public policy and therefore void. *Barngrover v. Pettigrew*, 128 Iowa 533, 535, 104 N.W. 904, 904 (1905) (holding where express object of contract was to bring about a dissolution of marriage and to put an end to the various duties and obligations resulting from the marital union, contract was against public policy and void).

 This court has also expressed a general reluctance to become involved in intimate questions inherent in personal relationships. *See Miller v. Miller*, 78 Iowa 177, 179–80, 42 N.W. 641, 641 (1889). In

*Miller*, we refused to enforce a contract between husband and wife that required, in part, each "to behave respectfully, and fairly treat the other." *Id.* at 180, 42 N.W. at 641. We explained our refusal on the following grounds:

> [J]udicial inquiry into matters of that character, between husband and wife, would be fraught with irreparable mischief, and forbidden by sound considerations of public policy.
>
> It is the genius of our laws, as well as of our civilization, that matters pertaining so directly and exclusively to the home, and its value as such, and which are so generally susceptible of regulation and control by those influences which surround it, are not to become matters of public concern or inquiry.

*Id.* at 182, 42 N.W. at 642; *accord Heacock v. Heacock*, 108 Iowa 540, 542, 79 N.W. 353, 354 (1899) ("Husband and wife cannot contract with each other to secure the performance of their marital rights and duties."). Certainly reproductive decisions are likewise not proper matters of judicial inquiry and enforcement.

We have considered and rejected the arguments of some commentators that embryo disposition agreements are analogous to antenuptial agreements and divorce stipulations, which courts generally enforce. *See* Apel, Vermont Bar Journal at 31. Whether embryos are viewed as having life or simply as having the potential for life, this characteristic or potential renders embryos fundamentally distinct from the chattels, real estate, and money that are the subjects of antenuptial agreements. Divorce stipulations are also distinguishable. While such agreements may address custody issues, they are contempo-

---

**3.** This court has not had a breach-of-contract-to-marry case before it in over fifty years. *See Bearbower v. Merry*, 266 N.W.2d 128, 132

(Iowa 1978) (citing *Benson v. Williams*, 239 Iowa 742, 32 N.W.2d 813 (1948)).

raneous with the implementation of the stipulation, an attribute noticeably lacking in disposition agreements.

In addition to decisional and statutory authority supporting a public policy against judicial enforcement of personal decisions concerning marriage, family, and reproduction, our statutes also anticipate the effect of a couple's dissolution on their prior decisions. For example, Iowa Code section 633.271 provides that if a testator is divorced after making a will, "all provisions in the will in favor of the testator's spouse" are automatically revoked. Similarly, Iowa Code section 633.3107 revokes all provisions in a revocable trust in favor of the settlor's spouse upon divorce or dissolution of the marriage. Similar considerations make enforcement of contracts between partners involving such personal decisions as the use and disposition of their combined genetic material equally problematic. As noted by one commentator, embryos are originally created as "a mutual undertaking by [a] couple to have children together." Coleman, 84 Minn. L.Rev. at 83. Agreements made in that context are not always consistent with the parties' wishes once the mutual undertaking has ended.

We think judicial decisions and statutes in Iowa reflect respect for the right of individuals to make family and reproductive decisions based on their current views and values. They also reveal awareness that such decisions are highly emotional in nature and subject to a later change of heart. For this reason, we think judicial enforcement of an agreement *between a couple* regarding their future family and reproductive choices would be against the public policy of this state.

Our decision should not be construed, however, to mean that disposition agreements *between donors and fertility clinics* have no validity at all. We recognize a disposition or storage agreement serves an important purpose in defining and governing the relationship between the couple and the medical facility, ensuring that all parties understand their respective rights and obligations. *See A.Z.*, 725 N.E.2d at 1057 n. 22 ("We also recognize that agreements among donors and IVF clinics are essential to clinic operations."). In fact, it is this relationship, between the couple on the one side and the medical facility on the other, that dispositional contracts are intended to address. *See generally* Ellen A. Waldman, *Disputing Over Embryos: Of Contracts and Consents,* 32 Ariz. St. L.J. 897, 918 (2000) (noting "courts and most scholarly authorities would transform documents designed to record the transmission of medical information from clinic to couple, and the couple's acceptance of medical treatment, into a binding agreement between the couple itself"). Within this context, the medical facility and the donors should be able to rely on the terms of the parties' contract. *See A.Z.*, 725 N.E.2d at 1057 n. 22 (noting court's decision not to enforce agreement between partners is not an "impediment to the enforcement of such contracts by the clinics or by the donors against the clinics"); *J.B.*, 783 A.2d at 719.

In view of these competing needs, we reject the contractual approach and hold that agreements entered into at the time in vitro fertilization is commenced are enforceable and binding on the parties, "subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored embryo." *J.B.*, 783 A.2d at 719. This decisional model encourages prior agreements that can guide the actions of all parties, unless a later objection to any dispositional provision is asserted. It also recognizes that, *absent a change of heart by one of the partners,* an agreement gov-

erning disposition of embryos does not violate public policy. Only when one person makes known the agreement no longer reflects his or her current values or wishes is public policy implicated. Upon this occurrence, allowing either party to withdraw his or her agreement to a disposition that person no longer accepts acknowledges the public policy concerns inherent in enforcing prior decisions of a fundamentally personal nature. In fairness to the medical facility that is a party to the agreement, however, any change of intention must be communicated in writing to all parties in order to reopen the disposition issues covered by the agreement. *Id.*

▬ That brings us, then, to the dilemma presented when one or both partners change their minds and the parties cannot reach a mutual decision on disposition. We have already explained the grave public policy concerns we have with the balancing test, which simply substitutes the court as decision maker. A better principle to apply, we think, is the requirement of contemporaneous mutual consent. Under that model, no transfer, release, disposition, or use of the embryos can occur without the signed authorization of both donors. If a stalemate results, the status quo would be maintained. The practical effect will be that the embryos are stored indefinitely unless both parties can agree to destroy the fertilized eggs. Thus, any expense associated with maintaining the status quo should logically be borne by the person opposing destruction. *See* Coleman, 84 Minn. L.Rev. at 112 ("The right to insist on the continued storage of the embryos should be dependent on a willingness to pay the associated costs.").

▬ Turning to the present case, we find a situation in which one party no longer concurs in the parties' prior agreement with respect to the disposition of their frozen embryos, but the parties have been unable to reach a new agreement that is mutually satisfactory. Based on this fact, under the principles we have set forth today, we hold there can be no use or disposition of the Wittens' embryos unless Trip and Tamera reach an agreement.[4] Until then, the party or parties who oppose destruction shall be responsible for any storage fees. Therefore, we affirm the trial court's ruling enjoining both parties from transferring, releasing, or utilizing the embryos without the other's written consent.

IV. *Division of Trip's Retirement Account.*

In its decree, the trial court divided the parties' joint property and debts, awarding Trip's retirement account entirely to him. In order to equalize the division of assets and liabilities, the court ordered Trip to make a cash payment to Tamera of $5276. In his cross-appeal, Trip asserts the court should have awarded Tamera a share of Trip's retirement account to equalize the property division, rather than making him responsible for a cash payment to Tamera. He claims that the retirement account carries an income tax burden that now rests entirely on him, whereas none of the assets awarded to Tamera carries any tax consequence upon liquidation. *See generally* Iowa Code § 598.21(1)(*j*) (instructing the court to consider "[t]he tax consequences to each party" in dividing the property of the parties). Tamera responds that it would be inequitable to make her wait to retirement to obtain her share of this asset.

We initially observe that the parties expressly removed the matter of tax conse-

---

4. We do not mean to imply that UNMC's obligation to store the embryos extends beyond the ten-year period provided in the parties' contract.

quences from the trial court's consideration in their pretrial stipulation, which states: "The parties agree that no tax consequence issue needs to be addressed by the Court." This issue was apparently removed from the court's consideration because both parties contemplated that the retirement account would be divided between them after adjusting for the value of the account earned by Trip prior to the parties' marriage. During trial both Trip and Tamera testified with respect to their personal wishes as to the disposition of each asset, stating their preference for who should be awarded each particular item. As to the retirement account, they both testified they wanted it to be divided equitably between them. Despite Tamera's protestations on appeal that she should not have to wait until retirement to obtain her share of this asset, she appeared quite willing to do so at the time of trial. We turn, then, to a consideration of the fairness of the court's award of cash to Tamera in lieu of a share of Trip's retirement account.

■■■ Although Tamera correctly points out the court did not order Trip to liquidate his retirement account, there are no other assets that Trip has at his disposal that would be sufficient, alone or in combination, to make the cash payment to Tamera required by the court's decree. Consequently, as a practical matter the court's property division will require Trip to liquidate some portion of his retirement account with the attendant penalties of early withdrawal. *Cf. In re Marriage of Hayne*, 334 N.W.2d 347, 353 (Iowa Ct.App.1983) (affirming valuation of retirement account without any depreciation for potential tax liability, noting court did not order liquidation of account and it was "evident that respondent had other assets available to meet the court's orders without liquidating it"). Therefore, we think a fairer division

of the parties' assets would eliminate the cash payment and substitute a $5276 share of Trip's retirement account to Tamera. Consequently, we remand this case for the preparation and execution of the required documents to accomplish this transfer.

## V. *Trial Attorney Fees.*

The trial court ordered Trip to pay $1000 towards Tamera's trial attorney fees because Trip's income "is substantially larger than Tamera's." Trip contends this amount was excessive for two reasons. First, he points to his payment of temporary alimony of $250 per month and his prior payment of $600 towards Tamera's attorney fees. He also claims a trial was necessary primarily due to Tamera's position on alimony and disposition of the frozen embryos, issues on which Trip prevailed at trial. Trip does not dispute on appeal that he is more financially able to pay the attorney fees.

■■■ Our consideration of this issue is guided by the following principles:

Trial courts have considerable discretion in awarding attorney fees. Whether attorney fees should be awarded depends on the respective abilities of the parties to pay. In addition, the fees must be fair and reasonable.

*In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994). Trip points to no case where this court has considered whether the party requesting trial attorney fees was successful at trial. *Cf. id.* (stating court considers "whether the party making the request [for attorney fees] was obligated to defend the trial court's decision *on appeal*" in awarding *appellate* attorney fees (emphasis added)).

■■■ When we evaluate Trip's challenge to the trial court's award of attorney fees in light of the relevant factors, we find no abuse of discretion. Trip has more

ability to pay the fees than does Tamera and there is no claim the fees are not fair and reasonable. Therefore, we affirm the trial court's attorney fee award.

VI. *Summary and Disposition.*

We affirm the trial court's decree in all respects except the equalization payment Trip was ordered to make to Tamera. We modify the decree to eliminate that award and substitute in its place a division of Trip's retirement account allocating $5276 to Tamera and the balance to Trip. We remand this case for entry of an order consistent with this decision.

**AFFIRMED ON APPEAL AND MODIFIED ON CROSS–APPEAL. CASE REMANDED.**