# IN THE COURT OF APPEALS OF IOWA

No. 13-1751
Filed December 10, 2014

IN RE THE MARRIAGE OF ANGELA RENEE JOHNSTON
AND JEREMY JAMES JOHNSTON

Upon the Petition of
ANGELA RENEE JOHNSTON,
 Petitioner-Appellee,

And Concerning
JEREMY JAMES JOHNSTON,
 Respondent-Appellant.

_____

Appeal from the Iowa District Court for Audubon County, Timothy
O'Grady, Judge.

The appellant, Jeremy James Johnston, appeals from the property
division entered as a result of a dissolution of his marriage with Angela Renee
Johnston. **AFFIRMED AS MODIFIED.**

Gregory J. Siemann, Carroll, for appellant.

Joel Baxter of Wild, Baxter & Sand, P.C., Guthrie Center, for appellee.

Heard by Vaitheswaran, P.J., Mullins, J., and Goodhue, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**GOODHUE, S.J.**

The appellant, Jeremy James Johnston, appeals from the property division entered as a result of a dissolution of his marriage with Angela Renee Johnston.

## I. Background Facts and Proceedings

Jeremy and Angela were married July 28, 2007. They have no children. On July, 16, 2013, when the dissolution trial was held, Jeremy was thirty-one years of age and Angela was thirty-four. Angela has a B.A. in psychology and a master's degree in educational psychology. She has been employed as a school psychologist during the period of the marriage, and her income has increased from approximately $40,000 per year to $60,000 per year. In addition, her employment provided the usual fringe benefits. Jeremy has been involved in farming since he was a teenager. He attended Iowa State University and received a degree in agriculture but continued to farm while in college and became a full-time farmer in 2004 when he graduated.

At the time of the marriage Angela had a net worth of $68,000 and Jeremy had filed a financial statement with his lender showing a net worth of $187,120 as of January 3, 2007. Jeremy contends his net worth was substantially higher in July when the parties were married, which he estimates to have been $364,534. During the marriage Jeremy received a certificate of deposit from his grandmother in the amount of $27,308.76 and received a $16,000 settlement as a result of a personal injury received in an automobile accident. In anticipation of the marriage, the parties purchased one and one-half acres with a house on it from Jeremy's father, Steven. The two properties are intertwined with each

other. The electric utility connection for Jeremy's house is located on Steven's farm, they share driveways memorialized by easements, and Jeremy's septic system laterals are in part located on Steven's land.

Jeremy has always farmed with Steven and they have shared labor and equipment. Jeremy owns grain bins on Steven's land, they store machinery in each other's machine sheds, and share grain storage. Jeremy owns forty percent of a cattle herd and Steven owns the other sixty percent. There is no written contract between Steven and Jeremy other than easements for access into each other's property. Jeremy has a sprayer and sprays Steven's crops as well as doing custom work for the neighbors. Steven owns a combine, which both parties use. Jeremy contends he has received an advantage in the form of equipment usage and services from the joint operations, which he considers a gift. He contends it was a gift that should be taken into consideration in the property settlement. Jeremy put together an after-the-fact calculation of the amount he claimed had been gifted by his father during the marriage and arrived at the sum of $179,795.69.

The parties are heavily leveraged and Jeremy requested that the assets be sold, the debts paid, and the remainder divided between the parties with each party paying the tax due on their share of the proceeds. He contends it is inequitable to place all of the tax burden on him. The trial court noted in its decree that the relationship between Steven and Jeremy in their farming operation and intertwined ownership of their assets would have a detrimental effect on any sale and accordingly formed an alternative division of the marital property.

The trial court set off Jeremy's injury settlement in the amount of $16,000 and the gift from his grandmother in the amount of $27,508.36 and did not include those sums in the marital assets of the parties. The trial court made no allowance for premarital property or allowance to Jeremy for the claimed gift from Steven and did not consider any tax consequences that might result from the decree entered.

The trial court awarded property to Angela that had an undisputed net value of $80,104, and to Jeremy property that had an undisputed net value of $942,494 after subtracting the $16,000 accident payment and the debt of $498,991 that Jeremy was to assume. The trial court in effect valued the marital assets of the parties at $1,022,598. To equalize the property received by each party, Jeremy was ordered to pay Angela $431,495. Jeremy was ordered to pay $97,266 by October 25, 2013, and the balance in $50,000 installments with the first to be paid on January 7, 2014, and a like payment on January 7 of each following year until paid in full. The amounts due were to begin bearing interest at 2.12% per annum on the balance due beginning August 19, 2013.

Jeremy has appealed, contending that the property division was inequitable because it failed to take into consideration Steven's gifts to him by way of farm machinery or its usage and services, or the premarital property brought into the marriage. In addition both parties mentioned the tax consequences, or lack of tax consequences, to Jeremy created by the property division.

## II. Standard of Review

Dissolution matters are reviewed de novo. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). Precedent is of little value as each case depends on its particular facts. *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995). The trial court's ruling will be modified only when it fails to do equity. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005).

## III. Discussion

The final valuations arrived at by the trial court were set out in the decree and the two subsequent amendments. Apparently the parties had agreed to freeze their financial status as of December 31, 2012, but the agreement was not made in writing. Jeremy continued to operate the farm on an ongoing basis after December 31, 2012, until the date of trial. The court noted it attempted to give effect to the agreement where possible even though the valuations in dissolutions are to be made as of the date of the trial. Nevertheless, the agreement created significant confusion. Fortunately for this court, neither party has objected to the property values arrived at by the trial court.

The objective in a division of property between spouses is to divide the property equitably based on the factors set out in Iowa Code section 598.21(5) (2011), but an equitable division is not necessarily an equal division. *In re Marriage of Hanson*, 733 N.W.2d 683, 702 (Iowa 2007). The factors relevant to this case are: (a) the length of the marriage; (b) the property brought into the marriage; (c) the contribution of each party to the marriage, giving appropriate economic value to each party's contribution and homemaking; (f) the earning capacity of each party; (i) other economic circumstances of each party; and

(j) the tax consequences to each party. *See* Iowa Code § 598.21(5). Furthermore,

> Property inherited by either party or gifts received by either party prior or during the course of the marriage is the property of that party and is not subject to a property division under this section except upon a finding that refusal to divide the property is inequitable to the other party.

*Id.* § 598.21(6).

The trial court set off $27,508.36 Jeremy received as a gift from his grandmother that had been used to purchase forty percent of Steven's cattle herd. This amount was subtracted from Jeremy's interest in the cattle in the trial court's calculation of the marital assets of the party. Also not included as a marital asset was the $16,000 Jeremy received as a result of the personal injury award. There is no dispute as to these exclusions from the marital property.

Jeremy maintains he was subsidized by his father by use of his father's machinery and services in his farming operation. There was never a written agreement between Jeremy and his father, nor was there any testimony that an oral agreement existed. There was no evidence they charged each other, kept a record of the exchanges, or intended to do so until the dissolution was filed. The trial court stated in its original decree, "It is not reasonable or equitable that the value of the marital assets should be reduced on Jeremy's retroactive calculation of the value of labor and equipment shared over the years with his father."

Even though in dissolution matters issues raised on appeal are determined anew, weight is given to the trial court's findings. *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003). Similar post-dissolution calculations of gifts of work or equipment in joint farming operations have been denied by the

courts. *See In re Marriage of McDermott*, 827 N.W.2d 671, 679-80 (Iowa 2013); *In re Marriage of Miller*, 552 N.W.2d 460, 463 (Iowa Ct. App. 1996). The relationship between Jeremy and Steven was likely mutually beneficial to both parties. The trial court was not convinced of the credibility of Jeremy's after-the-fact computation without any basis of a prior agreement or paperwork. There may have been some gifting, but Angela also may have been intended to be a joint beneficiary even though Steven denied any intent of making a gift to Angela. A parent's assistance to help a child establish a farming operation or any other business is a long-held tradition and should be encouraged rather than discouraged. Nevertheless, in this particular case because of the lack of documentation contemporary with the gift, it is difficult to quantify the claimed gifting with any specific value.

Jeremy contends the property division was inequitable because the premarital property was not considered, and we agree. As of January 1, 2007, Jeremy filed a financial statement showing a net worth of $187,120. As of the date of the marriage Angela testified she had a net worth of $68,000. A financial statement filed with their lender January 7, 2008, showed a net worth of $533,948. Jeremy attempts to show his net worth as of the date of marriage by averaging his financial statement of January 7, 2008, with his January 1, 2007 financial statement and thereby establishing a net worth of $364,534. It can be acknowledged that Jeremy's net worth could have been appreciably higher on July 28, 2007, the date of the marriage, than it was on January 1, 2007, but how to calculate that increase reasonably is problematic. Angela correctly contends that the increase in net worth from January 1, 2007, to January 7, 2008, was in

part the result of her efforts and contributions after the marriage. Her argument has merit. Nevertheless, the jump in the net worth by January of 2008 indicates there was some increase in Jeremy's net worth between January 2007 and the date of the marriage.

The tax consequence of the decree as it exists was not specifically raised as creating an inequity in the property division, but both parties discussed it in their respective briefs, and it was an issue thoroughly discussed and subject to extensive testimony at the time of trial. It is with good reason that Jeremy wants the property sold and divided with each party paying the tax due on their part of the sale. When no sale is anticipated it has been held that the tax consequence of a sale is not to be considered. *McDermott*, 827 N.W.2d at 684; *In re Marriage of Friedman*, 466 N.W.2d 689, 691 (Iowa 1991). These cases are distinguishable from the situation under consideration. In both of the cited cases capital assets were involved and the capital gains tax was the primary tax that would have been assessed.

The Johnstons' agricultural assets are primarily machinery and equipment, § 1231 property under the internal revenue code, and not capital assets subject to favorable tax treatment. *See* 26 U.S.C.A. § 1231. Even when buildings are involved the parties have taken advantage of the special allowance for depreciation. In the event of a sale the sale price, to the extent it exceeds the remaining basis, will need to be recaptured as ordinary income. There is testimony from the Johnstons' tax preparer that the property the Johnstons had paid $986,025 to purchase had only a $140,000 remaining basis due largely to accelerated depreciation. There was testimony that the tax on liquidation of the

depreciated assets was estimated to be $250,000. Angela indicated the $250,000 in tax consequences from the sale was excessive but provided no alternative calculation and pointed out no fallacy in Jeremy's expert's calculation of the tax that would be due. More importantly even if liquidation is avoided, Jeremy is left with assets with very little basis to depreciate. Whether the assets are sold or retained, Jeremy will be paying back the depreciation taken either through a current loss of depreciation if retained or on the recaptured depreciation if sold.

We conclude it is appropriate to consider the tax consequences when one party is awarded a disparate amount of the marital assets that have a reduced tax basis because the parties have taken excess depreciation even though a sale may not be anticipated. It is particularly appropriate to do so when the excess depreciation has augmented the parties' apparent marital assets. An exact determination of how the excess depreciation might financially impact Jeremy in the future or how much the savings created by the excess depreciation has increased the parties' apparent marital assets is not possible. The estimated tax on the sale gives guidance but is not a tool that can be used with precision. The lack of a precise measurement does not deter us from considering the tax consequences of the property division regardless of whether a sale is anticipated. This is a situation rarely encountered when capital assets such as land and corporate stock are involved.

The parties have enjoyed a substantial gain in net worth during the marriage. Partially this gain is due to good decision-making, commendable efforts, and an outstanding agricultural economy, but it is also because of their

ability to take depreciation, and particularly section 179 and special depreciation, which allows an owner to deduct up to one hundred percent of the cost of an asset in the year of purchase. 26 U.S.C.A. § 179. The parties' depreciation schedule attached to their 2011 tax return, the last joint return the parties filed, reveals they had taken approximately $490,000 of section 179 depreciation and over $87,000 of special depreciation prior to December 31, 2011, most of which took place during the marriage. Even though Angela was making from $40,000 to $60,000 each year, refunds of over $14,000 were received by the parties during the marriage. The excess depreciation has substantially increased the net worth of the parties by deferring their income tax and diminishing Jeremy's self-employment tax during the marriage.

In addition to the excess depreciation, tax consequences also emanate from the fact that the tax returns of the parties have been filed on a cash basis. The assets awarded to Jeremy included over $150,000 in prepaid seed and fertilizer. The prepayment substantially decreased the tax payable during the year the prepaid expenses were made and increased the apparent marital assets of the parties. The prepayment of those expenses means Jeremy could not deduct them in the following year when the production and the income from the expenses took place. Once again taxable income has been deferred. To divide the equity in the parties' assets equally and shift all the deferred tax to Jeremy is not an equitable result.

The contention that Jeremy can continue to defer the tax as he has done in the past is unrealistic. During the period of marriage a taxpayer had the option to take section 179 depreciation for the full cost of the equipment up to $250,000

to $500,000 in the year of purchase. For that to continue is highly unlikely, looking at the provisions of the statute. *See* 26 U.S.C.A. § 179.

Furthermore, the Johnstons have been able to acquire the machinery and equipment and prepay expenses to take advantage of deductions by expanding and using borrowed money. There are limitations on Jeremy's future ability to expand by using borrowed money. Any lender will necessarily have to consider the property settlement obligations and potential depreciation recapture in the event of a forced liquidation with the knowledge that farm income and the value of agricultural assets vary substantially from year to year. The trial court was justifiably concerned about the parties not recovering full value if it were to order a liquidation sale as a part of the dissolution. In the same manner a banker must measure the discount in the event of a repossession sale.

Finally, the property settlement may require liquidation if Jeremy is unable to borrow funds to continue the operation and pay the property settlement ordered. Two banks had refused to finance him as of the date of a posttrial hearing on October 2, 2013. The denials were exhibits made of record. There is an undercurrent in the record that Jeremy's father would bail him out, but that should not be involved in our determination of the marital property division. Potential family assistance is not one of the factors listed under Iowa Code section 598.21(5) to be considered in property divisions.

Our supreme court has recognized a public policy in favor of preserving family farms and providing awards and payment schedules in order that the farm operation may remain viable. *In re Marriage of Callenius*, 309 N.W.2d 510, 515 (Iowa 1981). Jeremy is receiving a substantial cash award but the 2012 tax

return reveals it is was not even equivalent to his 2012 cash rent. Each payment made by Jeremy to Angela will require income sufficient to make the payment due as well as income to pay the tax on the funds generated to make the payment. Because of the reduced basis in the property he has been awarded and the resulting depreciation base there will be very little if any excess cash flow available. The six years of this marriage have included the most profitable years for Iowa grain production in recent history. There is little reason to expect that level of income to continue. There is a very real possibility that Jeremy will need to borrow or sell assets to make equalizing payments to Angela, which further justifies consideration of the tax consequences. *See In re Marriage of Hogeland*, 448 N.W.2d 678, 680-81 (Iowa Ct. App. 1989).

## IV. Conclusion

We have concluded it is more equitable to award each party the value of their premarital property. An equitable division does not necessarily mean an equal division. *In re Marriage of Webb*, 426 N.W.2d 402, 405 (Iowa 1988). We approve the property and debt division made by the trial court but reduce the cash settlement due from Jeremy to Angela to $260,000. We have subtracted Jeremy's premarital property of $187,420 and Angela's premarital property of $68,000 from the total equity of $1,022,598, leaving marital assets available for division of $767,178. If a sale were to be conducted and $250,000 of tax became due the marital assets would be reduced to $517,178. We believe the adjustment appropriately takes into consideration the disparity of what each brought into the marriage and the tax consequences of the deferred income tax. The $260,000 equalization payment shall bear interest per the original decree at

the rate of 2.12% per annum beginning as of August 19, 2013. An initial payment shall be made January 10, 2015, of $80,000, followed by annual payments in increments of $40,000 per annum beginning on the tenth day of January 2016, and continuing on the tenth day of January of each succeeding year until the principal balance and the accrued interest have been paid in full.

We deny Angela's request for appellate attorney fees. Costs on appeal are assessed one-half to each party.

**AFFIRMED AS MODIFIED.**