**IN THE COURT OF APPEALS OF IOWA**

No. 14-0468
Filed June 24, 2015


**IN RE THE MARRIAGE OF JILL R. MILLER
AND SHAWN W. MILLER**

**Upon the Petition of
JILL R. MILLER,**
        Petitioner-Appellee/Cross-Appellant,

**And Concerning
SHAWN W. MILLER,**
        Respondent-Appellant/Cross-Appellee.
_____


        Appeal from the Iowa District Court for Cerro Gordo County, Colleen D.

Weiland, Judge.


        A former husband appeals and a former wife cross-appeals from various

provisions of the dissolution decree.  **AFFIRMED ON BOTH APPEALS.**


        Dani L. Eisentrager of Eisentrager Law Office, Eagle Grove, for appellant.

        Nicholas T. Larson of Larson Law Office, P.L.L.C., Osage, for appellee.


        Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**POTTERFIELD, J.**

Shawn Miller challenges the child custody and visitation provisions of the decree dissolving his marriage to Jill Miller. Jill Miller cross-appeals from the property distribution and attorney fee provisions. We do not disturb the decree, affirming on both appeals.

**I. Background Facts and Proceedings.**

Jill Miller and Shawn Miller were married in September 2009. They had a child together in April 2010. Jill was the child's primary caregiver. Until 2012, the family lived in Missouri and Shawn was employed by the Army. While in Missouri, Jill had provided in-home child care, and worked part-time as a registration clerk at a regional medical center. Shawn contemplated retiring in 2013, and the family discussed moving to Meservey, Iowa, where both parties' parents lived. Jill and the child moved to Meservey in August 2012 and began living with Jill's parents. Shawn travelled to Iowa over the Labor Day weekend. Jill and the child went to Missouri in November 2012 to attend Shawn's retirement ceremony.[1] Shawn moved to Iowa on December 12 (though his official retirement date was in March 2013) and moved in with his parents. The parties did not live together when Shawn moved to Iowa. In March 2013, Shawn obtained employment as a correctional officer at the prison in Fort Dodge (approximately seventy-five miles from Meservey).

Jill filed a petition for dissolution of marriage on March 25, 2013. Jill asked that physical care of the child be placed with her. Shawn asked that physical care be with him. Neither party sought joint physical care.

---

[1] The ceremony was apparently held some months before his actual retirement.

Jill and the child live in Meservey, within blocks of both Jill's and Shawn's parents. At the time of trial in December 2013, Jill was an administrative assistant at Iowa Specialty Hospital in Belmond, earning $14.00 per hour and working between thirty-two and thirty-five hours per week during the business hours of 8:00 a.m. to 4:30 p.m., Monday through Thursday. Using the average of three recent pay stubs, the trial court found her annual income is $25,818 ($2152 per month), plus monthly payments of $134.33 from Shawn's military pension.

Shawn attended the law enforcement academy in Des Moines in April 2013. He moved to Fort Dodge in May. At the time of trial (December 5 and 6, 2013), he stated he would be working four, ten-hour shifts (9:30 p.m. to 7:30 a.m.), Friday through Monday. Shawn earns $19.00 per hour as a full-time correctional officer and also receives a military pension. Using the average of five recent pay slips, the trial court found Shawn's annual income from the prison is $40,714 ($3393 per month), and he also receives monthly military pension benefits of $1502.67. Shawn pays child support for a child from a previous marriage in the amount of $502.78 per month.

On February 17, 2014, the district court entered a dissolution decree. Rejecting both parties' attempts to cast the other in a negative light, the court found both Jill and Shawn to be suitable custodians who had provided appropriate care for their child. The court ordered joint legal custody and placed physical care with Jill. Noting it had considered all relevant statutory and case law factors, the trial court found the physical care "decision turns on the narrowest of factors" and ordered physical care of the child with Jill because "Jill has a regular work schedule that will take place largely while the child is in

school," which "better promotes stability and security for the child." The court

cautioned,

> The court makes this determination with some hesitation. I do think that Jill and her family are more negative about Shawn and his family than vice versa. Jill may also be of a mindset wherein she always needs a "bad guy," and Shawn is a convenient target. Jill should be aware that undermining Shawn and micromanaging the child's time with him will manifest negatively in the long term. Nonetheless, the regularity of Jill's household schedule outweighs these concerns.

The court then set Shawn's parenting time, which provides in pertinent

part (inasmuch as the 2014-15 school year is essentially over):[2]

> Shawn shall therefore exercise parenting time of the child as follows, unless the parties otherwise agree. *The court expects Jill to be flexible and generous in arranging Shawn's parenting time around his work schedule.*
> . . . .
> <u>During the school year during and after the 2015-16 year</u>:
> (1) alternating weekends from Friday after school until Sunday at 8:00 p.m. In the event there is no school on the Friday before or the Monday after a parenting weekend, Shawn's parenting time shall extend into that extra day. Shawn shall provide transportation to start his weekend parenting, and Jill shall provide transportation to resume her physical care. And
> (2) one weekday every week—designated by Shawn—from after school until 8:00 p.m. Shawn's weekday parenting may extend overnight if he can provide timely transportation to school the following morning. Shawn shall provide transportation.
> <u>During all summer school breaks</u>, every third week from Wednesday to Wednesday. Shawn shall designate the start time, and he shall provide transportation to start his summer parenting weeks. Jill shall designate the end time, and she shall provide transportation to resume her physical care.

(Emphasis added.) The court ordered alternating holidays, and further ordered

"Jill and Shawn shall strive to accommodate and rearrange their respective

parenting times so the child may be present at the special occasions of the other

---

[2] We do not address Shawn's arguments concerning provisions which governed time periods that have passed.

party, including but not limited to weddings, baptisms, funerals, confirmations and graduations." Shawn was ordered to pay $710.80 per month in child support.

The court divided the parties' assets, awarding Jill net assets of $12,538 and Shawn $23,339. To equalize the property award, the court ordered Shawn to pay Jill $5400. The trial court awarded each the vehicle in that party's possession: Shawn had a 2008 Toyota Tundra valued at $24,250; $7455 of which Shawn had paid prior to the parties getting married, for a net value of $16,795. Jill had a 2010 Chevrolet Traverse valued at $19,525, which is subject to a loan in the amount of $10,180, for a net value of $9345. The parties' marital home in Missouri had been sold, with net proceeds being $14,985. The trial court did not include these proceeds in the marital assets, finding Shawn had applied those proceeds to pay off the indebtedness on his Toyota Tundra ($11,000) and "assumed the remaining $3685 was used for ongoing expenses." The court also did not include the 2012 tax refund in the amount of $3831 Jill had retained, which she had used "in large part for attorney fees."

Shawn appeals, contending the physical care and visitation provisions should be changed. Jill cross-appeals, contending the trial court improperly set aside premarital property to Shawn, erred in not including the house-sale proceeds in the marital assets, and abused its discretion in only awarding her $1500 in trial attorney fees. She also requests an award of appellate attorney fees.

**II. Scope and Standard of Review.**

We review equity matters de novo. Iowa R. App. P. 6.907. Although we decide the issues raised on appeal anew, we give weight to the factual findings,

especially in regard to witness credibility. *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003). Decisions on the physical care of a child are made by considering the child's best interests. *In re Marriage of Decker*, 666 N.W.2d 175, 177 (Iowa Ct. App. 2003).

We review the district court's award of trial attorney fees for an abuse of discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

**III. Discussion.**

*Physical Care.* In reviewing the district court's decision, we consider an array of factors. *See* Iowa Code § 598.41(3) (2013); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). Our goal is to determine which parent "will do a better job raising the child." *Decker*, 666 N.W.2d at 177. On our de novo review, we—like the trial court—have considered the relevant factors enunciated in Iowa Code section 598.41(3)[3] and determine both parents are capable and appropriate caregivers for their child. Jill's work schedule and the fact that Jill resides in a community where both her and Shawn's extended

---

[3] The pertinent factors in this case include:
      a. Whether each parent would be a suitable custodian for the child.
      b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
      c. Whether the parents can communicate with each other regarding the child's needs.
      d. Whether both parents have actively cared for the child before and since the separation.
      e. Whether each parent can support the other parent's relationship with the child.
      . . . .
      h. The geographic proximity of the parents.
Iowa Code 598.41(3).

families reside tip the scale toward the court's placement of physical care of the child with Jill.

We emphasize the parties have joint legal custody, which means they are entitled to "equal participation in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.41(5)(b). We note too that our law requires a custody award that will "assure the child maximum continuing physical and emotional contact with both parents" after divorce, including "liberal visitation rights where appropriate." Iowa Code § 598.41(1)(a). Having been awarded physical care, Jill is required to support Shawn's relationship with the child. *See id.* ("[T]he parent responsible for providing physical care shall support the other parent's relationship with the child.").

*Parenting Schedule.* Shawn argues that if the physical care provision is not changed, then the parenting schedule should be. But we find no reason to disturb the parenting schedule set forth in the decree. We note the schedule governs unless the parties otherwise agree to some other schedule and we reiterate the trial court's cautionary, "[t]he court expects Jill to be flexible and generous in arranging Shawn's parenting time around his work schedule."

*Property Distribution.* Jill objects to the district court having set aside to Shawn premarital payments on his vehicle. She also contends the court should have included the proceeds from the sale of the marital home.

Iowa is an equitable distribution state. This "means that courts divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property, in an equitable manner in light of the

particular circumstances of the parties." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). We will disturb the trial court's distribution of the marital property "'only when there has been a failure to do equity.'" *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013) (quoting *Schriner*, 695 N.W.2d at 496).

"In dissolution-of-marriage cases, marital property is to be divided equitably, considering the factors outlined in Iowa Code section 598.21[(5)]." *In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). Thus, we consider the "length of the marriage"; the "property brought to the marriage by each party"; the "contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services"; the parties' ages and physical and emotional health; each party's earning capacity; and any other relevant economic circumstances and factors. Iowa Code § 598.21(5). "Premarital property may be included in the divisible estate. The district court may assign varying weight to premarital property, but should not automatically award it to the spouse who owned the property prior to the marriage." *McDermott*, 827 N.W.2d at 678 (citation omitted).

In this marriage of short duration (the parties resided together for about three years), we find no failure to do equity in the property distribution here. While the district court stated it was not including the house sale proceeds Shawn used or the 2012 tax proceeds Jill kept, including those values would not lead us to alter the property distribution.

The trial court calculated the assets awarded to Jill: a vehicle with a net value of $9349 plus IPERS funds in her name of $2991 plus a bank account of

$198, for a total of $12,538. As for Shawn, the court awarded him a vehicle with a net value of $16,795 (book value of $24,250 less $7455 in premarital payments)[4] plus IPERS in his name of $4674 plus bank accounts of $1870, for a total of $23,339. The trial court ordered Shawn to pay Jill $5400 as an equalization payment.[5] Finding no failure to do equity, we affirm.

*Trial Attorney Fees.* Jill complains the trial court's order that Shawn pay $1500 ($500 was ordered when temporary matters were considered and the decree ordered he pay an additional $1000) in her attorney fees was insufficient.

"An award of trial attorney fees rests in the sound discretion of the trial court and will not be disturbed in the absence of an abuse of discretion." *In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997). Whether attorney fees should be awarded depends on the parties' respective abilities to pay, *see Sullins*, 715 N.W.2d at 255, and fees awarded must be fair and reasonable. *See In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994). We find the district court did not abuse its discretion in the amount of attorney fees awarded.

*Appellate Attorney Fees.* Jill seeks an award of appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). We consider the needs of the party making the request, the ability of the

---

[4] Shawn testified he made $7455 in payments on the Tundra prior to the marriage. The trial court set this value aside to Shawn. We do not find this inequitable under the circumstances of this short-term marriage.

[5] If we were to add to the marital assets the moneys the court found the parties had "consumed," that is the house sale proceeds of $14,985 and the 2012 tax proceeds of $3831, this would be additional marital assets of $18,816. Assigning one-half the value to each party ($9408), Jill would be awarded net proceeds of $21,946 and Shawn would be awarded net proceeds of $32,747, for a difference of $10,801. One-half of that difference is $5400.50.

other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* After considering these factors, we decline to award appellate attorney fees.

Costs are assessed one-half to each party.

**AFFIRMED ON BOTH APPEALS.**