# IN THE COURT OF APPEALS OF IOWA

No. 20-0090
Filed January 21, 2021

IN RE THE MARRIAGE OF SURAJ GEORGE PAZHOOR
AND HANCY CHENNIKKARA PAZHOOR

Upon the Petition of
**SURAJ GEORGE PAZHOOR,**
        Petitioner-Appellee,

**And Concerning**
**HANCY CHENNIKKARA PAZHOOR, n/k/a HANCY CHENNIKKARA,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

        Hancy Chennikkara appeals the decree dissolving her marriage to Suraj Pazhoor. **AFFIRMED AS MODIFIED.**

        Jenny L. Weiss of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque, for appellant.

        Darin S. Harmon and Jeremy N. Gallagher of Kintzinger, Harmon, Konrardy, P.L.C., Dubuque, for appellee.

        Heard by Mullins, P.J., and May and Schumacher, JJ.

**MULLINS, Presiding Judge.**

Hancy Chennikkara appeals the decree dissolving her marriage to Suraj Pazhoor. Hancy argues the court erred in (1) placing the parties' children in their shared physical care, (2) awarding her an inadequate spousal-support award, (3) calculating Suraj's medical-support obligation, and (4) not awarding her attorney fees. Hancy requests an award of appellate attorney fees.

**I.      Background Facts and Proceedings**

The parties met in 2002 and were married a few months later. At the time of their marriage, both parties were finishing their medical educations in India. The marriage ultimately produced two children—a daughter, born in 2008, and a son, born in 2013. There is no question both parties are loving and devoted parents and the children are bonded to them.

At the time of the dissolution trial, Suraj was almost forty-three years of age and in good physical health. Suraj was born and raised in India. Following his formative education, Suraj pursued medical school in Russia, which he successfully completed in seven years. Thereafter, Suraj worked in a research position in Switzerland for about one year before returning to India to participate in an internship for about another year. He took his medical boards in India, but he did not pass.

Hancy was forty at the time of trial. Hancy suffers from migraines from time to time. At the time of trial, she was migraine free for six months. Suraj was of the belief she had not had a migraine for six or seven years. Hancy also suffered a fall while in medical school, resulting in a back condition, "spondylosis with a spondylothesis." According to Hancy, the condition causes "extremely debilitating"

"acute chronic episodes," the last of which she experienced roughly four months before trial. Suraj testified he had not heard Hancy complain about her back in nine or ten years. Hancy was born and raised in the Chicago, Illinois area. After graduating from high school, she went directly to medical school in India. She completed the educational portion of the program in six years, after which she married Suraj. She then completed the one-year internship portion of the program after the parties were married.

After the parties married, they moved to the United States in 2003, where they lived with Hancy's parents in Illinois. Both parties began studying for their medical boards in the United States. The parties lived with Hancy's parents for one year, then an apartment for two years, and then a condo. Neither passed the boards the first time they tried. Suraj passed his boards in 2007, but Hancy did not.[1] Hancy was preparing to take the exam again, but then her father was diagnosed with cancer and she learned she was pregnant. After giving birth, Hancy continued to study, but her fear of failing again was "overwhelming." Thereafter, Hancy was a stay-at-home mom. She has not furthered her education. Her passage of certain parts of the boards has expired, so if she were to decide to revive her efforts to become a licensed physician, she would have to start all over.

The parties moved to Wisconsin in 2012 following Suraj's completion of residency, where Suraj took a job in a hospital. They lived in Wisconsin just shy

---

[1] The medical boards consist of four parts. To apply for residency, one must pass the first three parts, and then the final part is completed at the end of residency. Hancy was successful on her first attempt at the first exam, while Suraj did not successfully complete until his second go around. Both passed the second part of the boards their first try. Hancy was never able to successfully complete the third part of the exam.

of four years, after which they moved to Dubuque, Iowa, where Suraj obtained new employment. Suraj continues to work in Dubuque as the director and lead hospitalist of a medical group, in which he is a partner. He testified he commonly works twelve to fourteen hours per day, and works seven days and then has seven days off. Sometimes Suraj has to go in for meetings or tend to other emergency matters during his week off. According to Hancy, until recently, Suraj continued to work three or four of the seven days off. Suraj agreed in his testimony that, historically, he does not regularly work a week on and then have a week off. He later testified he had to take extra shifts because the group was not fully-staffed. Hancy also testified that, on the days Suraj did not work, he would not assist with getting the children up and ready for school, transporting them, taking them to appointments, or assisting with homework. Hancy explained Suraj preferred to spend his time away from work relaxing, and he would usually work out, watch television, or go out. Suraj's annual income in 2018 amounted to $500,742.19. Through the time of trial in August 2019, Suraj's income for calendar year 2019 amounted to $252,172.51. He testified, based on what he earned so far, he anticipated he would have an ultimate annual income for 2019 in the amount of $415,152.00.

While Suraj's career has blossomed, Hancy has supported him and tended to the logistics of the moves from state to state, finances, childcare, and the children's development. She has also had a hand in advancing Suraj's career. Historically, Hancy has been the parent who has tended to and organized the children's education, extracurricular activities, and medical care. Hancy worked at a church as a teacher and a coffee shop as a barista at the time of trial. Hancy

brings in $918.00 per year working at the church. She earns $8.00 per hour at the coffee shop and agreed she would be able to work twenty hours per week. The district court awarded Hancy a marital condominium in Illinois, which the evidence suggests nets $490.00 in annual income. Hancy also has passive income from business interests gifted to her that averaged $13,838.00 in annual net income over the last few years. Hancy has been exploring the possibility of pursuing a master's degree in public health, although she had not decided what type of career she would pursue with such a degree. She testified the programs she was considering would need to determine her medical school credits are transferable before she could enter any of the programs. If the credits are determined to not be transferable, then she would need to take undergraduate courses. The programs she was considering would take two to three years to complete on a full-time basis. Suraj was of the opinion Hancy could obtain employment providing $100,000.00 to $200,000.00 in annual income in a nonclinical medical role.

On mother's day, in May 2018, Hancy accused Suraj of having an extramarital affair.[2] According to Suraj, this accusation was made in front of the children, who were "traumatized." Suraj petitioned for the dissolution of the parties' marriage in August. Suraj requested the children be placed in the parties' joint physical care, and Hancy requested the children be placed in her physical care, subject to Suraj's right to visitation. The parties continued to reside together in the marital home through March 2019, at which point Suraj moved for an order

---

[2] We expressly note Iowa is a no-fault dissolution-of-marriage state. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007). "[W]e only consider a party's indiscretions if [a] child was harmed by the behavior." *In re Marriage of Rothfus*, No. 13-1745, 2014 WL 2885340, at *4 (Iowa Ct. App. June 25, 2014).

concerning temporary custody, visitation, and support. In May, Suraj withdrew his request for a temporary order, noting the parties agreed to continue to reside together until their marriage was dissolved.

The matter proceeded to a trial over two days in August. Following trial, the court awarded the parties joint legal custody and placed the children in the parties' joint physical care. While the court acknowledged "Hancy has been the primary caregiver for the children," and such circumstance "does not favor shared care," the court pointed out other factors—the parties' ability to communicate respectfully, the low level of conflict between the parents, and their general agreement on child-rearing practices—weighed in favor of a joint-physical-care arrangement.

For purposes of child support, the court found Suraj's income to be $500,742.18. The court rejected Suraj's position that Hancy could obtain employment in the medical field that would provide her with a six-figure annual income.[3] However, the court found "Hancy is capable of earning more than she is currently earning" and she is "capable of working full time at an hourly rate of $12.00." Thus, the court assigned Hancy an imputed income of $24,960.00. Coupled with her rent income from the condo and passive-business-interest income, the court assigned Hancy a total annual income of $40,000.00 for child-support purposes. The court found Suraj's insurance premium attributable to the children was $363.00 per month. Factoring that figure into the child-support

---

[3] At trial, Suraj requested the court to assign Hancy with $200,000.00 in imputed income based on her medical degree and his opinion she could obtain positions in the medical field.

guidelines resulted in Hancy having a health-insurance add on obligation in the amount of $129.89.

On the issue of spousal support, Hancy requested traditional support in the amount of $12,000.00 per year. Suraj proposed monthly support of $5000.00 for five years. Weighing the factors contained in Iowa Code section 598.21A(1) (2018), the court concluded an award of spousal support was appropriate, "but only for a rehabilitative period that will allow Hancy to pursue further education and which she can use her prior medical education." The court awarded Hancy monthly rehabilitative spousal support of $7500.00 for five years. The court denied Hancy's request for an award of attorney fees.

Hancy filed a motion to reconsider, enlarge, or amend, pursuant to Iowa Rule of Civil Procedure 1.904(2). Hancy argued allowing Suraj a deduction for the child's health-insurance premium was error because the premium was paid by Suraj's employer and is not an out-of-pocket expense for Suraj. She also argued the court erred in assigning her an imputed income of $40,000.00 and her award of spousal support and the denial of her request for attorney fees were inequitable. The court denied the motion on all issues relevant to this appeal.

Hancy appeals.

## II. Standard of Review

Appellate review of dissolution proceedings is de novo. Iowa R. App. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *Fennelly*, 737 N.W.2d at 100. Because the court bases its decision on the unique

facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009). As to child custody, our principal consideration is the best interests of the children. Iowa R. App. P. 6.904(3)(o); *see In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983).

**III.** **Analysis**

    A.    Physical Care

Hancy challenges the district court's imposition of a shared-physical-care arrangement. Where, as here, "joint legal custody is awarded to both parents, the court may award joint physical care to both joint custodial parents upon the request of either parent." Iowa Code § 598.41(5)(a). "'Physical care' means the right and responsibility to maintain a home for the minor child[ren] and provide for the routine care of the child[ren]." *Id.* § 598.1(7). Under a joint-physical-care arrangement, "both parents have rights and responsibilities toward the child[ren] including but not limited to shared parenting time with the child[ren], maintaining homes for the child[ren], providing routine care for the child[ren] and under which neither parent has physical care rights superior to those of the other parent." *Id.* § 598.1(4). Physical-care determinations are based on the best interest of *children*, not "upon perceived fairness to the *spouses.*" *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.*

We consider the following nonexclusive factors in determining whether a joint-physical-care arrangement is in the best interests of children:

> (1) "approximation"—what has been the historical care giving arrangement for the child[ren] between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99).

On the issue of approximation, we agree with Hancy that she has been the primary care provider to the children and main facilitator in essentially every aspect of the children's development. But we disagree with Hancy's characterization of Suraj as an uninvolved parent. While Suraj has assumed a more traditional role in the family as the breadwinner, he has participated in the caregiving and upbringing of the children. While the pending dissolution has caused problems for the children, the district court was correct that the children "are bonded to each of their parents, both of whom have demonstrated an ability to attend to the children's needs." When either parent would be a suitable physical custodian, stability and continuity of caregiving are primary factors in considering whether joint physical care should be ordered. *Hansen*, 733 N.W.2d at 696. While Suraj's busy work schedule has necessarily placed more of the day-to-day and behind-the-scenes parenting responsibilities on Hancy, we find Suraj to be an engaged parent when he is able. While Hancy's historical status as the primary caregiver weighs in her favor on the issue of approximation, and we agree with the district court this "factor does not favor shared care," "our case law requires a multi-factored test where no one criterion is determinative." *See id.* at 697.

We turn to the remaining factors, the parties' ability to communicate and show mutual respect, the degree of conflict between them, and the extent they are in general agreement about their approach to daily matters. *Id.* at 698–99. On the issue of communication, Hancy faults Suraj for limiting his contact with her while he is at work to text messaging. But we find Suraj's explanation that he is largely unable to answer his phone at work as a hospital physician tending to patients reasonable to say the least. Hancy also highlights that she frequently made decisions about the children without communicating with Suraj. But that appears to have been the status quo, and Suraj was comfortable with allowing Hancy to make decisions because he trusts her as a parent. Hancy agrees "there is not a lot of conflict between the parties," but notes the parties do minimally disagree about extracurricular activities when the younger child's activities overlap, resulting in double-booking. Hancy also agrees "[t]here is little argument between [the parties] regarding child rearing." But she argues Suraj simply defers to her because she has done all the child rearing.

On these factors, we adopt the district court's assessment:

The relationship between the parties is strained under the weight of these proceedings, but they are able to communicate with one another with a sufficient level of respect, which leads [us] to conclude that they will be able to communicate with one another as adults going forward.

Hurt aside, the level of conflict between the parties is relatively low. . . . The parties have argued, which is to be expected given the fact they are seeking a divorce, but the arguments have not been volatile or physical in any way. There is no evidence that either party has ever felt afraid for his or her safety or that of their children because of the conflict between the parties.

Suraj and Hancy generally agree on child-rearing practices. They are both intelligent people who place a high value on education and academic achievement. They are both Catholic and intend for their children to follow in that faith. They agree the children should

be involved in extra-curricular activities as well, although Suraj believes that this should be somewhat limited so that the children don't get "double-booked." This appears to be the biggest difference the parties have with regard to child-rearing; in the grand scheme of things, it is not a major difference.

While the approximation factor does not favor shared care, consideration of the remaining factors results in a conclusion that shared care would be workable. But the *Hansen* factors are non-exclusive, and the overarching inquiry is whether such an arrangement would be in the children's best interests. *See id.* at 699– 700. A joint-care arrangement involving equal time with each of these suitable and devoted parents "will assure the child[ren] the opportunity for the maximum continuing physical and emotional contact with both parents" and "will encourage the parents to share the rights and responsibilities of raising the child[ren]," which is in the children's best interests. *In re Marriage of Kunkel*, 555 N.W.2d 250, 253 (Iowa Ct. App. 1996); *accord* Iowa Code § 598.41(1)(a); *In re Marriage of Gensley*, 777 N.W.2d 705, 714 (Iowa Ct. App. 2009) ("The district court shall make an award that . . . assures the children the 'opportunity for the maximum continuing physical and emotional contact with both parents." (citation omitted)).

Upon our de novo review of the record and consideration of the *Hansen* factors and other relevant matters,[4] we find placement of these children in the

---

[4] "The factors the court considers in awarding custody are enumerated in Iowa Code section 598.41(3)." *In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Court App. 1996). "Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, . . . the factors listed here as well as other facts and circumstances are relevant in determining" physical care. *Hansen*, 733 N.W.2d at 696. We note our consideration of whether each parent would be a suitable custodian, whether the children will suffer due to lack of active contact with and attention from both parents, whether the parents can effectively communicate about the children's needs, whether both parents have actively cared for the children, whether each parent can support the other's relationship with the

parties' shared physical care is in their best interests.[5] We affirm the district court's physical-care determination.

B. Income

We first address Hancy's claim, subsumed in her claim the court's spousal-support award is inadequate, that the court erred in assigning her an imputed annual income of $40,000.00. The court reached this figure based on Hancy's rent and business income and the court's assumption Hancy is "capable of working full time at an hourly rate of $12.00." The record discloses Hancy intends to pursue a master's degree in the coming years. Based on this intent, the court awarded her rehabilitative spousal support for five years. No evidence was presented concerning any full-time employment Hancy could obtain while sharing care of two young children and pursuing her master's degree. And, like the district court, we reject Suraj's position that Hancy could immediately enter the workforce after absence therefrom for several years and earn a six-figure salary.

The district court used $40,000.00 as Hancy's imputed income in determining both child and spousal support. The first step under the guidelines is to "compute the net monthly income of each parent," which is ascertained by first

children, whether one or both parents agree to or oppose shared physical care, and the geographic proximity of the parents. *See* Iowa Code § 598.41(3)(a)–(e), (g), (h). We also note our consideration of the characteristics of the children and parents, the children's needs and the parents' capacity and interests in meeting the same, the relationships between the parents and children, the effect of continuing or disrupting an existing physical-care arrangement, the nature of each proposed environment, and any other relevant matter disclosed by the evidence. *See In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).

[5] In order to find otherwise, we would be required to make "specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child." Iowa Code § 598.41(5)(a). This we cannot do on the record in this case.

determining each parent's gross monthly income and then subtracting specified taxes and deductions. Iowa Ct. R. 9.14(1). Gross monthly income includes "reasonably expected income from all sources." Iowa Ct. R. 9.5(1). The court may not impute income except "[p]ursuant to agreement of the parties, or . . . [u]pon request of a party, and a written determination is made by the court under rule 9.11." Iowa Ct. R. 9.5(1)(d)(1).

> The court may impute income in appropriate cases subject to the requirements of rule 9.5. If the court finds that a parent is voluntarily unemployed or underemployed without just cause, child support may be calculated based on a determination of earning capacity. A determination of earning capacity may be made by determining employment potential and probable earnings level based on work history, occupational qualifications, prevailing job opportunities, earnings levels in the community, and other relevant factors. The court shall not use earning capacity rather than actual earnings or otherwise impute income unless a written determination is made that, if actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs of the child(ren) or to do justice between the parties.

Iowa Ct. R. 9.11(4).

Upon our de novo review of the record evidence, we are unable to conclude Hancy is voluntarily underemployed or substantial injustice would occur or adjustments would be necessary to provide for the needs of the children or to do justice between the parties. *See id.* And the assumption that she could immediately obtain full-time employment making $12.00 per hour is uncertain and speculative. *See Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005). Relying on "the most reliable evidence presented," *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991), we calculate Hancy's income as follows. Her gross employment income as a barista and teacher amounts to $9238.00. The three-year average income she obtained from her passive business interests in two limited liability

companies amounts to $13,387.00 per year. And the gross income Hancy receives from renting the condo is $490.00 per year.[6] Thus we calculate Hancy's gross income to be $23,115.00.

### C. Spousal Support

Hancy argues the district court's award of $7500.00 in monthly rehabilitative spousal support for five years is inadequate. "[W]e accord the trial court considerable latitude in making th[e] determination [of spousal support] and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Stenzel*, 908 N.W.2d 524, 531 (Iowa Ct. App. 2018) (first and third alterations in original) (quoting *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005)).

Courts may grant an award of spousal support in a dissolution proceeding for a limited or indefinite length of time after considering all of the following relevant factors:

> (a) The length of the marriage.
> (b) The age and physical and emotional health of the parties.
> (c) The distribution of property made pursuant to section 598.21.
> (d) The educational level of each party at the time of marriage and at the time the action is commenced.
> (e) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> (f) The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> (g) The tax consequences to each party.

---

[6] Hancy, invites us to use $425.00 as her annual income from the condo. We choose to use the income listed for the condo on the parties' 2017 tax return, $490.00.

. . . .
       (j) Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1).

Hancy "does not challenge the court's award of rehabilitative alimony." Instead, she claims it should be supplemented with other forms of support. "We begin by noting that types of spousal support—whether categorized as traditional, rehabilitative or reimbursement—are not mutually exclusive." *Stenzel*, 908 N.W.2d at 531. We are not limited to awarding only one type of support or characterize the award as one form or another. *Id.* We are simply required to consider the statutory factors and ensure equity is achieved between the parties. *See id.* Iowa law is clear "that whether to award spousal support lies in the discretion of the court, that we must decide each case based upon its own particulars, and that precedent may be of little value in deciding each case." *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015).

We proceed to the statutory factors. The length of the marriage, seventeen years, is near the twenty-year durational threshold warranting an award of traditional support. *See* Iowa Code § 598.21A(1)(a); *Gust*, 858 N.W.2d at 410–11. And this was a traditional marriage, with the parties agreeing Hancy would stay at home and raise the children. We find this factor to weigh in favor of an award of traditional support.

Both parties are in their early forties and, while Hancy has some physical health issues and the proceedings have caused some emotional trauma, the parties are both in relatively good physical and emotional health. *See* Iowa Code § 598.21A(1)(b). Given the parties' age and health, both have many years left of

employability. However, in those ensuing years, Suraj will unquestionably continue to have a much higher income. We find this factor weighs in favor of a spousal-support award in some form.

Both parties left the marriage with substantial assets, both netting roughly $337,754.50 from marital property,[7] and Hancy also retaining her premarital business interests, in addition to other premarital assets totaling $136,565.12. *See id.* § 598.21A(1)(c). While Hancy left the marriage with more assets, this is only one factor under consideration.

Each party's education was relatively equal at the time of the marriage, but only Suraj was able to further his medical education during the marriage by proceeding to residency and practicing medicine for several years. *See id.* § 598.21A(1)(d). While Hancy possesses the equivalent of a medical degree, she had not put that degree to use at the time the dissolution proceeding commenced, and Suraj's ability to practice medicine over several years has unquestionably been a continuing educational journey. We find this factor weighs in favor of a spousal-support award in some form.

The imposition of a spousal-support obligation is predicated on the need of the receiving spouse and the paying spouse's ability to pay. *See Gust*, 858 N.W.2d at 411; *see also* Iowa Code § 598.21A(1)(e), (f). "[T]he yardstick for determining need [is] the ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Gust*, 858 N.W.2d at 411 (quoting Iowa Code § 598.21A(1)(f)). As to need, we focus on earning

---

[7] The parties also stipulated to distribution of a 401(k) account by way of a qualified domestic relations order.

capability of the party seeking maintenance, not necessarily actual income.  *Id.*; *see* Iowa Code § 598.21A(1)(e).  While Hancy has an impressive educational background, determining her earning capacity is somewhat of a nebulous task given her length of absence from the job market and resulting lack of training, employment skills, and work experience.  *See id.* § 598.21A(1)(e).  What is clear is that Hancy's earning capacity will undoubtedly continue to be dwarfed by Suraj's, even if she successfully pursues her master's degree and finds employment in the six-figure range as Suraj believes she can.  The disparity between the parties' income will continue to be significant.  *See Gust*, 858 N.W.2d at 411 (indicating such a disparity weighs in favor of an award of spousal support).

The record affirmatively establishes that Hancy will no longer be able to support a standard of living reasonably comparable to that which she enjoyed during the marriage.  *See* Iowa Code § 598.21A(1)(f).  Absent an award of spousal support, her life will no longer be subsidized by Suraj's contributions, and the lifestyle she enjoyed during the marriage would be unattainable.  Spousal support is appropriate for the purpose of allowing Hancy to live in a manner approaching her lifestyle during the marriage.

Upon our consideration of the factors contained in section 598.21A(1), we find an award of hybrid spousal support in favor of Hancy is appropriate.[8]  We are mindful that if she pursues further education or other professional career options, any such pursuit is likely to take a number of years and considerable expense.  It

---

[8] We decline Hancy's request that we calculate her award based on the guidelines of the American Academy of Matrimonial lawyers.  *See Gust*, 858 N.W.2d at 412 ("[W]e do not employ a mathematical formula to determine the amount of spousal support.").

is also likely she would not be able to accomplish such goals if she were working full time. We have also considered the likelihood that any such new career will require some period of employment before she is able to earn income commensurate with sustaining a lifestyle approaching her current one. She has asked for spousal support in the amount of $12,000.00 for twelve years. In balancing the interests of the parties, we recognize recent changes in federal income tax laws will result in spousal support payments by Suraj will not be tax deductible and the payments received by Hancy will not be taxable. *See In re Marriage of Mann*, 943 N.W.2d 15, 21 (Iowa 2020).

Based on the foregoing and our de novo review of the record, we determine Suraj shall pay to Hancy spousal support in the amount of $9000.00 per month for a period of seven years, which amount will then be reduced to $8000.00 per month for a period of three years, then reduced to $7000.00 per month for two years, at which time the spousal support obligation will terminate at the expiration of the twelve-year term. In the event Hancy remarries after the first seven-year period, but before expiration or satisfaction of the twelve-year spousal-support obligation, the support obligation shall terminate so long as Suraj is current on his obligations for support. In the event of the death of either party, the spousal support obligation shall terminate.[9]

---

[9] In oral argument, Suraj cited *Mann*, 943 N.W.2d 15 in support of his request that we affirm the district court's spousal-support award. We find *Mann* distinguishable because the husband seeking support in that case "did not materially sacrifice his economic opportunities to manage the household or provide domestic services for the family." *Mann*, 943 N.W.2d at 22. The higher-earning wife prepared the meals, tended to the two children, and managed the household. *Id.*

D.     Medical Support

Hancy argues the court erred in calculating Suraj's out-of-pocket medical support.  She claims his insurance premium attributable to the children is paid by his employer and is not paid out of pocket.  Suraj responds that Hancy has waived the issue for failure to cite legal authority.  *See* Iowa R. App. P. 6.903(2)(g)(3).  We decline to deem the issue waived, and we proceed to the merits.  *See id.*  Suraj acknowledged his paycheck does not show the deduction for insurance, but testified it comes out of his income in another manner.  Suraj's employment agreement provides, "In addition to each Employee's compensation . . . , each Employee shall . . . also be entitled to participate in . . . a health and dental insurance plan (including family coverage) . . . ."  The evidence also includes a listing of "Monthly Employee Health Insurance Cost," which showed the family plan to cost $519.00 per month and the single plan to cost $156.00.

Even if Suraj is correct the premium is reduced prior to the final calculation of his monthly gross income, he is already seeing that benefit when his gross income is factored in to the child-support calculation.  So subtracting it again later following the net monthly income computation does amount to, as Hancy coins it, "double dipping."  So we agree with Hancy that Suraj is not entitled to a deduction for the health-insurance premium attributable to the children, as it is already deducted to reach Suraj's gross income.  Having recalculated Hancy's income, above, we find it necessary to recalculate Suraj's child-support obligation, below, and will exclude the deduction for health insurance in our recalculation.

E.     Child Support

Based upon our disposition on the above issues, we recalculate Suraj's child-support obligation to be $527.22 for two children and $377.95 when only one child is eligible.[10]   This calculation is retroactive to the time of the entry of the decree.

F.     Attorney Fees

Finally, Hancy argues the court erred in declining to award her trial attorney fees.  We review the denial for an abuse of discretion.  *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006).  This is our most deferential standard of review.  *See State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017).  "Trial courts have considerable discretion in awarding attorney fees."  *In re Marriage of Witten*, 672 N.W.2d 768, 784 (Iowa 2003) (quoting *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994)).  "An award of attorney fees is based on the parties, respective needs and ability to pay."  *In re Marriage of O'Rourke*, 547 N.W.2d 864, 867 (Iowa Ct. App. 1996).

In her motion to reconsider, enlarge, or amend, Hancy acknowledged "[b]oth parties paid their attorney fees using marital funds during the pendency of the divorce," but complained "both parties had outstanding fees following trial," and equity required Suraj cover her outstanding fees.  The court ruled, "The award to

---

[10] This shared-care calculation is based on wage income for Suraj in the amount of $500,742.18.  Hancy's wage income is $9238.00 as a teacher and barista, and her income not subject to FICA from her passive-business and rent income is $13,877.00.  Suraj's $9000.00 spousal-support obligation is factored into each party's income.  Neither party challenges the district court's order that each party file as head of household and claim one child, so we apply those variables as well.  We factor in that health insurance is provided at no cost.

each party is sufficient for each party to be responsible for his or her own remaining attorney fees." Given the significant assets each party left the marriage with, we are unable to characterize the court's decision as "a manifest abuse of discretion," and we affirm the denial. *See id.*

Hancy also requests an award of appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *Berning*, 745 N.W.2d at 94. In determining whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* We also consider the relative merits of the appeal. *In re Marriage of McDermott*, 827 N.W.2d 687 (Iowa 2013). In consideration of these factors, we award Hancy appellate attorney fees in the amount of $3000.00. Costs on appeal are assessed to Suraj.

## IV.    Conclusion

We affirm the court's award of shared physical care. We modify the district court's spousal-support award as set out above. We agree with Hancy that Suraj is not entitled to a deduction for the health-insurance premium attributable to the children, as it is already deducted to reach Suraj's gross income. We modify Suraj's child-support obligation based on our calculation of Hancy's income, modification of spousal support, and conclusion Suraj is not entitled to a deduction for the health-insurance premium attributable to the children. We affirm the denial of Hancy's request for trial attorney fees, but we award Hancy appellate attorney fees in the amount of $3000.00. Costs on appeal are assessed to Suraj.

**AFFIRMED AS MODIFIED.**