**IN THE COURT OF APPEALS OF IOWA**

No. 21-0448
Filed January 12, 2022

**IN RE THE MARRIAGE OF MATTHEW FREY
AND CHEYENNE KERRES**

**Upon the Petition of
MATTHEW FREY,**
        Petitioner-Appellee,

**And Concerning
CHEYENNE KERRES,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Sean McPartland,

Judge.


        The mother appeals the award of physical care of the parties' child to the

father and the amount of her child support obligation.  In the alternative she seeks

increased visitation time.  **AFFIRMED AS MODIFIED AND REMANDED.**


        Rae M. Kinkead of Simmons Perrine Moyer Bergman PLC, Cedar Rapids,

for appellant.

        Justin D. Riem of Arenson Law Group, P.C., Cedar Rapids, for appellee.


        Considered by Mullins, P.J., and May and Ahlers, JJ.

**AHLERS, Judge.**

In this original dissolution-of-marriage action, a mother's failure to respect the father's role in parenting their young child played a pivotal role in the district court's decision to grant physical care of the child to the father. The mother asks us to reverse the district court's physical-care determination. For the reasons that follow, we decline to do so.

Matthew Frey and Cheyenne Kerres married in 2017. In early 2018, the parties separated when Cheyenne asked Matthew to move out of the marital home. He complied with the request. At the time the two separated, Cheyenne was far along in her pregnancy with their child. After Cheyenne gave birth and was still in the hospital, Matthew tried to visit the child. Cheyenne immediately began limiting Matthew's time with the child, limiting him to less than one hour in the hospital and then insisting that he "give her some space" after she left the hospital. Even though the child was conceived and born during the marriage and Cheyenne knew Matthew was the father, she refused to list Matthew as the father on the child's birth certificate.

After Cheyenne and the child went home from the hospital, Cheyenne unilaterally created a visitation schedule that limited Matthew to visiting the child at Cheyenne's home for minimal amounts of time per week. Matthew was not permitted to leave Cheyenne's home with the child based on Cheyenne's unsubstantiated fears that Matthew would take the child indefinitely. At one point, when Matthew arrived at Cheyenne's house equipped with a car seat and expressed a desire to exercise his time with the baby at his own home, Cheyenne responded by refusing to allow Matthew to see the child for nearly one month.

Realizing he was not getting anywhere in his efforts to get meaningful time with his child on a voluntary basis, Matthew filed a dissolution-of-marriage proceeding and requested a hearing on temporary matters. The court issued a temporary order granting Cheyenne physical care subject to Matthew's visitation. It was not until this court intervention when the child was five months old that Matthew was permitted overnight visitation with his child for the first time. At the temporary hearing, the court admonished Cheyenne for withholding visitation from Matthew.

Due in part to delays associated with the COVID-19 pandemic, the case did not go to trial until over two years after filing of the petition. The parties agreed to joint legal custody. At trial, Matthew requested shared physical care of the child with an alternative request for physical care. Cheyenne was steadfast in her opposition to shared physical care. Her position was that she should be granted physical care. The district court denied Matthew's request for shared physical care, finding it unworkable given the parties' history of conflict and inability to communicate effectively. Faced with competing claims for physical care, the court granted Matthew physical care, granted Cheyenne significant visitation rights, and ordered Cheyenne to pay child support.

Cheyenne appeals. She contends she should have been granted physical care. In the alternative, she asserts she should have been granted more visitation. Finally, she argues the child support she was ordered to pay is not supported by the evidence of the parties' respective incomes. Matthew requests appellate attorney fees.

## I.      Standard of Review

We review marriage dissolution cases de novo.[1]  "Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses."[2]

## II.     Physical Care

Neither party contests the district court's decision to deny the parties joint physical care of the child.  Because joint physical care is not granted, "the court must choose a primary caretaker who is solely responsible for decisions concerning the child's routine care."[3]  The overriding consideration in determining the physical-care arrangement for a child is the child's best interest.[4]  In making the physical-care determination, "[w]e are guided by the factors set forth in Iowa Code section 598.41(3) [(2018)] as well as those identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974)."[5]  In addition to these factors, the court must consider "the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, [which is] a significant factor in determining the proper custody arrangement."[6]

Here, both parents are well-suited to care for the child.  In fact, each testified that the other is a suitable parent and the child is safe in the other's care.  Neither

---

[1] *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

[2] *Sullins*, 715 N.W.2d at 247 (quoting *In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003)).

[3] *In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007).

[4] *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007).

[5] *Fennelly*, 737 N.W.2d at 101.

[6] Iowa Code § 598.41(1)(c); *see also In re Marriage of Toop*, No. 19-0543, 2020 WL 110352, at *3 (Iowa Ct. App. Jan. 9, 2020) (applying section 598.41(1)(c) to a physical-care determination).

party poses a present threat to the safety and well-being of the child. The parties have had difficulty effectively communicating with each other, but those difficulties have not resulted in the child receiving inadequate care by either parent.

Faced with the reality that Matthew is her equal in parenting ability, Cheyenne relies heavily on her claim that she has been the child's primary caretaker since birth as a reason she should have been granted physical care. This invokes the approximation principle, which is the idea "that the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution."[7] The approximation principle is a factor to consider, but it is not dispositive.[8]

Here, we find the approximation factor unpersuasive. The child was born while the parties were already separated, so there is no significant pre-dissolution history to which we may defer. Any period of the child being primarily in Cheyenne's care is of such short duration that it carries little weight.

We also do not ignore Cheyenne's history of preventing contact between Matthew and the child. We decline to allow a parent to unilaterally and unreasonably block the other parent's access to the child and then use that artificially created caregiving schedule as support for the parent's claim for physical care. That is exactly what Cheyenne is trying to do here, so we find her claimed history of being the parent with physical care to be an unpersuasive factor. In fact, because each parent is well-suited to care for the child, we find Cheyenne's history

---

[7] *Hansen*, 733 N.W.2d at 697.
[8] *Hansen*, 733 N.W.2d at 697.

of denying Matthew time with the child to be a compelling factor that supports the grant of physical care to Matthew.

A child's best interests are generally served by maximum ongoing contact with both parents. Cheyenne clearly denied Matthew that opportunity for a large portion of the child's young life, and she openly admitted to feeling little remorse in doing so. Perhaps more troubling than her lack of remorse is her apparent inability to even recognize the inappropriateness of her conduct. In her testimony, she was dismissive of the admonishment she received from the judge who presided over the parties' temporary matters hearing about her refusal to allow Matthew a reasonable amount of time with the child.[9] Even though the trial occurred more than two and one-half years after the child's birth, she had still failed to take steps to have Matthew named as the father on the child's birth certificate. She made unilateral decisions about daycare without consulting Matthew. She then manipulated the daycare situation to try to force Matthew to pay extra if he utilized it, even though he was already paying half of the daycare cost and, without Cheyenne's manipulations, could have utilized the daycare without additional cost to either party. She repeatedly expressed antiquated beliefs that she had superior decision-making authority because she is the mother. While she is free to hold those beliefs, they are contrary to Iowa law, under which gender is irrelevant in making physical-care determinations.[10] The district court found her defiant,

---

[9] The judge who presided over the temporary matters hearing is not the same judge who presided at trial.

[10] *See Hansen*, 733 N.W.2d at 700 ("[I]n choosing a spouse for physical care, courts must avoid gender bias. There is no preference for mothers over fathers, or vice versa." (citation omitted)).

unreasonable, and to have disdain for Matthew's rights as a parent. On our de novo review, we find the same. Her apparent inability to accept the fact that Matthew is a good father and has rights as a father gives us little hope that she would properly support Matthew's relationship with the child if she were granted physical care. Her past behavior coupled with her attitude toward Matthew's rights as a father convinces us that it is in the child's best interests to be placed with Matthew, given the fact that both parents are otherwise well-suited to care for the child.[11]

In making this decision, we have not overlooked the fact that Cheyenne has another child—the half-sibling of this child in interest—who lives exclusively with Cheyenne. We also recognize there is a bond between the two children. We agree with Cheyenne that we prefer not to separate siblings, including half-siblings.[12] However, avoiding separation of siblings or half-siblings is just one factor. The ultimate consideration is the long-term interests of the child.[13] Here, we find it to be in the child's best interests to be placed with Matthew even though it results in separation of half-siblings. We reach this conclusion based on several considerations. First, the child in interest is relatively young, so, while bonded to her half-sibling, the bonding period is of relatively short duration. Second, the children are ten years apart in age, so this child will only be approximately eight

---

[11] *See* Iowa Code §§ 598.1(1) ("Refusal by one parent to provide [the opportunity for maximum continuous physical and emotional contact possible with both parents] without just cause shall be considered harmful to the best interest of the child."); .41(5)(b) ("[T]he parent responsible for providing physical care shall support the other parent's relationship with the child.").

[12] *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986) (applying the general rule that courts try to keep siblings together to half-siblings).

[13] *See Orte*, 389 N.W.2d at 374.

years old when her half-sibling reaches adulthood.[14]    Third, Cheyenne has significant visitation rights, which will provide opportunity for continued bonding between the half-siblings.  Fourth, the desire to avoid separation of half-siblings does not overcome our concerns previously noted as to the undermining of Matthew's relationship with his child if Cheyenne were granted physical care.  So, while separation of the half-siblings is unfortunate, it is necessary to secure the long-term best interests of this child.

For all of these reasons, we affirm the district court's decision to grant physical care of the child to Matthew.

**III.    Visitation**

With Matthew continuing to have physical care, Cheyenne argues that she should be awarded more visitation time.  Under the district court's decree, during any given two-week period, Cheyenne has overnight visits on two weekend nights (alternating weekends), one overnight weeknight in one week, and two overnight weeknights in the second week.  The parties essentially split holiday time with the child.  This results in Cheyenne having at least 130 overnight visits each year with the child.  This is a significant amount of visitation.  In fact, in the parlance of the child support guidelines, this constitutes "extraordinary" visitation.[15]  We find this to be an appropriate amount of visitation to "assure the child the opportunity for the

---

[14] *See In re Marriage of Brauer*, 511 N.W.2d 645, 647 (Iowa Ct. App. 1993) (distinguishing *Orte*, in part, because the half-siblings in *Orte* were only four years apart in age whereas the half-siblings here were thirteen years apart).

[15] *See* Iowa Ct. R. 9.9 (providing for an "extraordinary visitation credit" to the parent's child support obligation if the parent's visitation exceeds 127 days per year).

maximum continuing physical and emotional contact with both parents."[16]  We find Cheyenne's arguments for additional visitation to be unpersuasive, especially in light of the fact that granting her additional visitation would essentially backdoor her way into shared physical care—an arrangement she adamantly opposed at trial and that the district court rejected for good reason.  Following our de novo review, we affirm the visitation schedule set by the district court.

**IV.    Child Support**

When the court calculates child support, it looks first to the child support guidelines.[17]  To properly calculate child support under "the guidelines requires a determination of the net monthly income of the parents."[18]  The child support guidelines should not be deviated from unless the court makes a finding that the guidelines would be unjust or inappropriate.[19]  If the court finds a parent to be "voluntarily unemployed or underemployed without just cause, child support may be calculated based on a determination of earning capacity."[20]  The court must use the most reliable evidence presented to determine each parent's current monthly income.[21]

The district court set Cheyenne's child support obligation at $593.11 per month.  The district court noted that the incomes of both parties were disputed, but it did not make a determination of each party's income.  The district court also did not explain how it arrived at the $593.11 child-support figure, other than to say the

---

[16] *See* Iowa Code § 598.41(1)(a).
[17] *In re Marriage of Hilmo*, 623 N.W.2d 809, 811 (Iowa 2001).
[18] *Hilmo*, 623 N.W.2d at 811.
[19] Iowa Ct. R. 9.11.
[20] Iowa Ct. R. 9.11(4).
[21] *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991).

amount was in accordance with the child support guidelines worksheets submitted by Matthew. Matthew submitted multiple worksheets, each contemplating a different physical-care arrangement. It is unclear which worksheet the district court used. However, determining which worksheet was used is largely inconsequential, as each of Matthew's submitted worksheets used $75,000 per year as Cheyenne's gross income. Cheyenne contends this was an improper income figure to use in calculating her obligation.

Cheyenne was unemployed at the time of trial. Throughout her testimony, Cheyenne asserted that her unemployment situation is temporary, she has been actively applying for jobs, and she has secured several interviews. Despite this testimony that her unemployment is temporary and due only to the COVID-19 pandemic, she now claims on appeal the district court should have used her unemployment benefit income only to calculate her support obligation. When unemployment is temporary, the court can base child support on the party's income prior to the unemployment.[22] Because of the admittedly temporary nature of Cheyenne's unemployment, using her historical income to determine her child support obligation is appropriate. However, we find no basis in the record for using $75,000 per year as Cheyenne's income, as she has not historically earned that much. As an inflated income figure was used, we find the child support amount excessively high. Therefore, we modify that part of the district court's order setting Cheyenne's child support obligation at $593.11 per month and remand this case to the district court.

---

[22] *Powell*, 474 N.W.2d at 534.

On remand, as both parties' incomes are admittedly disputed, the district court shall make findings as to each party's income using the most reliable evidence available and set child support accordingly. It will be up to the district court to decide whether to use the evidence already presented to make the income and child support determinations or to hold a hearing to receive additional or current evidence on those issues. Upon making the income and child support determinations, the amount set for child support shall be retroactive to March 1, 2021 (the date originally set by the district court for commencement of Cheyenne's child support obligation). If, as we suspect will be the case, Cheyenne's child support obligation is less than $593.11 per month, the retroactive application of the new obligation will result in Cheyenne having overpaid if she is current on her child support obligation.[23] If there is an overpayment, the district court shall also determine an appropriate way for Cheyenne to recoup her overpayment based on the circumstances of the parties at the time of the determination on remand.[24]

## V. Appellate Attorney Fees

Matthew requests appellate attorney fees.

> Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. Factors to be considered in determining whether to award attorney fees include: the needs of the party

---

[23] If Cheyenne is not current on her child support obligation, the retroactive nature of the new child support obligation may not result in an overpayment, but simply a reduction in the amount of her arrearage.

[24] *See In re Marriage of Houser*, No. 19-1666, 2021 WL 1016923, at *2 n.1 (Iowa Ct. App. Mar. 17, 2021) (deferring to the district court's determination of an appropriate recoupment method based on the parties' circumstances as determined on remand in the event the parties are unable to agree on a recoupment method).

seeking the award, the ability of the other party to pay, and the relative merits of the appeal.[25]

Based on Cheyenne's limited ability to pay and her success on one issue on appeal, we deny Matthew's claim for appellate attorney fees.

## VI. Conclusion

We affirm that part of the district court's order granting physical care of the parties' child to Matthew and setting Cheyenne's visitation schedule. We modify that part of the district court's order setting Cheyenne's child support obligation. We remand for a determination of the parties' incomes and an appropriate child support amount based on those incomes, as explained in more detail earlier in this opinion. We deny Matthew's claim for appellate attorney fees. Costs on appeal are taxed two-thirds to Cheyenne and one-third to Matthew.

**AFFIRMED AS MODIFIED AND REMANDED.**

---

[25] *Sullins*, 715 N.W.2d at 255 (quoting *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005)).